| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE EASTERN DISTRICT OF TEXAS |
| 3 | SHERMAN DIVISION |

```
 4
    UNITED STATES OF AMERICA    )
 5
    VS.                         )   Criminal No. 4:18CR46
 6
    CRISTIAN MENDOZA            )
 7

 8  UNITED STATES OF AMERICA    )

 9  VS.                         )   Criminal No. 4:18CR188

10  DANIEL MENDOZA              )

11

12                  SENTENCING

13      BEFORE THE HONORABLE MARCIA A. CRONE

14         UNITED STATES DISTRICT JUDGE

15              SEPTEMBER 23, 2019

16
    APPEARANCES
17  FOR THE GOVERNMENT:          Mr. Ernest Gonzalez
                                 Assistant United States Attorney
18                               101 East Park Boulevard
                                 Suite 500
19                               Plano, Texas 75074
                                 (972)509-1201
20
    FOR THE DEFENDANT            Mr. Christopher Douglas Mulder
21  CRISTIAN MENDOZA            Attorney at Law
                                 2001 Bryan Avenue
22                               LB 92
                                 Dallas, Texas 75201
23                               214.953.1919

24

25
```

| | | |
|---|---|---|
| 1 | FOR THE DEFENDANT | Mr. Robert Owen Jenkins |
| | DANIEL MENDOZA: | Attorney at Law |
| 2 | | 717 N. Harwood |
| | | Suite 2650 |
| 3 | | Dallas, Texas 75201 |
| | | 214.953.1919 |
| 4 | | |
| 5 | COURT REPORTER: | Ms. Lori Barnett |
| | | 130 Jaron Drive |
| 6 | | Pottsboro, Texas 75076 |
| | | 903.821.3200 |
| 7 | | |

8

Proceedings recorded by mechanical stenography, transcript

9

produced by CAT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2                                                    PAGE

3        GOVERNMENT'S WITNESSES

4        JUSTIN MARSHALL
         Direct Examination by Mr. Gonzalez................... 17
5        Cross-Examination by Mr. Mulder...................... 66
         Cross-Examination by Mr. Jenkins..................... 74
6
         ROEL ASTRAN
7        Direct Examination by Mr. Gonzalez................... 77
         Cross-Examination by Mr. Mulder...................... 87
8        Cross-Examination by Mr. Jenkins..................... 92
         Redirect Examination by Mr. Gonzalez................. 94
9
         JESUS ORDAZ
10       Direct Examination by Mr. Gonzalez...................95
         Cross-Examination by Mr. Mulder......................103
11       Cross-Examination by Mr. Jenkins.....................106
         Redirect Examination by Mr. Gonzalez.................107
12
         JUSTIN SULLIVAN
13       Direct Examination by Mr. Gonzalez...................109
         Cross-Examination by Mr. Mulder......................112
14
         Certificate of Reporter..............................148
15

16

17

18

19

20

21

22

23

24

25

| | EXHIBITS | | |
|---|---|---|---|
| EXHIBIT | | OFFERED | ADMITTED |
| Government's 1 | | 23 | 23 |
| Government's 2A, 2B, 2C, and 2D | | 34 | 34 |
| Government's 7 | | 37 | 37 |
| Government's 8 | | 37 | 37 |
| Government's 3 | | 40 | 40 |
| Government's 4 | | 42 | 42 |
| Government's 5 | | 52 | 52 |
| Government's 6 | | 60 | 60 |
| Government's 9 | | 63 | 63 |

                    P R O C E E D I N G S

1                                                                  

**2**      THE COURT: All right. Today we have two matters,

**3**   Number 4:18CR46, and Number 4:18CR188. The first being

**4**   United States of America vs. Cristian Mendoza, and the

**5**   second, United States of America vs. Mr. Daniel Mendoza.

**6**      Now I received a revised presentence report on

**7**   Cristian Mendoza, and I'm a little confused. Are there

**8**   objections still on that? Probation seemed to indicate

**9**   that there were not objections on the revised report. Is

**10**  that true or not?

**11**      MR. MULDER: The objections I filed to the -- I

**12**  guess the first report are still -- I've not withdrawn

**13**  those. But there are no additional objections to the

**14**  rewrite, which was the revised report made on

**15**  September 10th.

**16**      THE COURT: Okay. But you still have the

**17**  objections that you had originally?

**18**      MR. MULDER: Yes, ma'am.

**19**      THE COURT: Okay. I should ask you though to

**20**  announce your appearance for the record. Everybody.

**21**      MR. MULDER: Oh, I'm sorry. Chris Mulder for

**22**  Cristian Mendoza.

**23**      MR. JENKINS: Robert Jenkins for Daniel Mendoza,

**24**  Your Honor.

**25**      MR. GONZALEZ: Ernest Gonzalez for the government.

1        The government is ready to proceed, Your Honor.

2                THE COURT:  All right.  So at this point there was

3        a revised report on Cristian Mendoza.  Now does the

4        government still have objections on Cristian Mendoza?

5                MR. GONZALEZ:  Yes, Your Honor.  We believe that

6        he should still receive the increase for maintaining the

7        apartment.

8                THE COURT:  I think he did receive an increase for

9        that.

10               MR. MULDER:  We didn't object to that.

11               THE COURT:  I think he didn't get an increase for

12       leader/organizer.

13               MR. GONZALEZ:  I'm sorry, that's right.  I'm

14       thinking of the other case.  Leader/organizer.  Yes.

15               THE COURT:  I think both of them had a stash

16       house, and probation recognized that and so it was put on

17       both of them, I think.

18               Is that not the case?  I'm seeing nods from

19       probation.

20               PROBATION OFFICER:  Yes, Your Honor.  That's

21       right.

22               THE COURT:  Okay.  So then the government has an

23       objection then to both of them not getting

24       leader/organize.  Is that basically the case?

25               MR. GONZALEZ:  Yes.

1          THE COURT:  Okay.  And then on Daniel Mendoza,

2    were there any objections by the defendant on that?

3          MR. JENKINS:  No, we did not file any objections.

4    We do have an objection to -- we just received the -- we

5    didn't -- those weren't included in the original PSI,

6    they were included later.  So we still have the -- if --

7    we want to have the -- we want to be heard on the

8    leadership role which they have not included yet.  So I

9    believe you're going to bring that up today, correct?

10         THE COURT:  Right.  But a leadership role was

11    included, so you didn't object.

12         MR. JENKINS:  Right.

13         THE COURT:  But you don't have objections to the

14    other things that were in there.

15         MR. JENKINS:  No, I don't.

16         THE COURT:  Okay.  That's what I'm trying to

17    figure out.  And then it's a little confusing because

18    there are two different case numbers.  So we have to keep

19    this sort of straight.  So I guess we can -- I don't know

20    how you want to do it, separately or together.

21         MR. GONZALEZ:  Your Honor, the witnesses will

22    testify about the two defendants jointly, so I think we

23    can do it together.  The case agent will summarize the

24    case briefly so the Court can see how it's one in the

25    same conspiracy, even though there are two separate

1    indictments.

2          THE COURT:  Okay.  Well then we'll begin.  We'll

3    start, and I'm going to ask a series of questions.  If we

4    could have Mr. Cristian Mendoza respond first, and then

5    Mr. Daniel Mendoza.  And then we'll get to the

6    objections.

7          I guess everybody -- does everybody have mics?  I

8    guess it may be a little difficult.  Is there a mic on

9    the table?

10          MR. MULDER:  I don't see a mic at the table.

11          THE CLERK:  They have their lapel mics.

12          THE COURT:  Okay.  But the defendants need to have

13    mics.

14          MR. JENKINS:  We can allow them to --

15          THE COURT:  Okay.  Maybe there's an extra.

16          MR. MULDER:  We'll just share this one.

17          THE COURT:  That sounds good.  All right.

18          All right.  So I'm calling Case Number 4:18CR46,

19    Defendant 16, and Number 4:18CR188, Defendant 1.  That

20    would be United States of America vs. Cristian Mendoza,

21    that's the 46 case.  And United States of American vs.

22    Daniel Mendoza, the 188 case.

23          All right.  So I'm going to ask a series of

24    questions. Mr. Cristian Mendoza respond first, and then

25    Mr. Daniel Mendoza.

1          Have counsel and defendant read and discussed the
2     presentence report, including any revisions?
3          DEFENDANT CRISTIAN MENDOZA:  Yes, ma'am.
4          DEFENDANT DANIEL MENDOZA:  Yes, ma'am.
5          THE COURT:  Has counsel fully explained the report
6     to the defendant?
7          MR. MULDER:  Yes, ma'am.
8          MR. JENKINS:  Yes, ma'am.
9          THE COURT:  And Mr. Cristian Mendoza and
10    Mr. Daniel Mendoza, do you fully understand the
11    presentence report?
12         DEFENDANT CRISTIAN MENDOZA:  Yes, ma'am.
13         DEFENDANT DANIEL MENDOZA:  Yes, ma'am.
14         THE COURT:  Does counsel or defendant wish to make
15    any comments, additions, or corrections to the report?
16         MR. MULDER:  None besides the ones we've already
17    made in writing, Your Honor.
18         MR. JENKINS:  None at this point, Your Honor.  I
19    believe we're expecting to hear from witnesses, but --
20         THE COURT:  Right.  I understand.  And did you
21    announce your appearance for the record?
22         MR. JENKINS:  Robert Jenkins for Daniel Mendoza,
23    Your Honor.
24         THE COURT:  All right.
25         And Mr. Cristian Mendoza and Mr. Daniel Mendoza,

1      does the report adequately cover your background?

2              DEFENDANT CRISTIAN MENDOZA:  Yes, ma'am.

3              DEFENDANT DANIEL MENDOZA:  Yes, ma'am.

4              THE COURT:  And has the government read the

5      report, and does it wish to make any comments, additions,

6      or corrections?

7              MR. GONZALEZ:  The government has read the report,

8      and we offer no comments, additions, or corrections to

9      the report, and we did file objections.

10             THE COURT:  All right.  So I'll hear the

11     government's objections first, unless you want to -- does

12     anybody want to hear the -- one defendant has objections.

13     Do you want to do this in a different order?

14             MR. GONZALEZ:  No, Your Honor.  They are the same

15     objections as to both defendants, that they did not

16     receive an enhancement for --

17             THE COURT:  I know, but one defendant has

18     objections, the other one doesn't.  So do we want to hear

19     that defendant's objections first, or do we want to hear

20     the --

21             MR. GONZALEZ:  That's fine, Your Honor.

22             THE COURT:  -- do we want to hear the

23     government's?

24             MR. MULDER:  I would like to.

25             THE COURT:  Okay.  Let's hear the defendant's

1    objections.

2        MR. MULDER:  Very well.

3        THE COURT:  Okay.

4        MR. MULDER:  Our first objection is to paragraph

5    36 for the enhancement to the firearm that was found when

6    the stash house was raided.

7        I believe that the government has a witness or two

8    that might address that and then we've got two

9    objections.

10       THE COURT:  All right.  Well it seems to me that

11   it was found there at that house, and it seems like it

12   would be reasonably foreseeable that we would have

13   perhaps more information after the testimony.

14       MR. GONZALEZ:  That's correct, Your Honor.  The

15   government's position is that as indicated, that was

16   their stash house.  They've got an increase for that, and

17   that the guns and drugs go together.  Guns are tools of

18   the trade for individuals involved in drug trafficking

19   that they are commonly found together.

20       This was their stash house.  The evidence will

21   show that they were distributing large quantities from

22   that stash house, so that it was inherently probable that

23   the firearm would be there for the protection of the

24   drugs and the drug proceeds.  And these are individual

25   coconspirators, codefendants that are in this case with

1  the defendant.  So therefore, it's not clearly improbable

2  to the individuals that were there, as well as

3  individuals that had the stash house for them.

4  THE COURT:  Well I think that would be correct.

5  Unless I hear something different later, I will overrule

6  that objection.

7  The second one has to do with some kind of

8  juvenile adjudication.

9  MR. MULDER:  Yes.  The next two objections is to

10  paragraph 49, 52 on the criminal history points.  49, I

11  think was -- I want to say probation addressed that when

12  they revised the report on August 20th.  But my objection

13  was it was too remote to be included.  To be fair,

14  probation revised it and put information in there that

15  said that Cristian Mendoza -- Cristian Mendoza had joined

16  in the conspiracy, I guess within the five year period.

17  THE COURT:  It seems like they placed him there no

18  later than 2016, and probably 2015, which would make it

19  timely.

20  MR. MULDER:  It said some unnamed codefendant did

21  that.  But other than someone debriefing and saying that

22  Cristian Mendoza was involved, I don't see anything else

23  to show that he was involved during the time period.

24  THE COURT:  These are matters probation would have

25  relied on.

1    Does probation have anything to add to that?

2    PROBATION OFFICER:  I'm sorry?

3    THE COURT:  Having to do with placing Cristian

4    Mendoza in the conspiracy no later than 2016, and

5    probably in 2015.

6    PROBATION OFFICER:  We had reports from two

7    cooperating defendants that corroborated those dates.

8    Initially I had one corroborating source in the report,

9    and following the filing of his objection I added a

10   second corroborating source.

11   THE COURT:  And you believe two corroborating

12   sources are adequate to find that?

13   PROBATION OFFICER:  Yes, ma'am.

14   THE COURT:  Generally that would be what probation

15   would look up.

16   MR. MULDER:  I just wanted to know who they were,

17   so I can --

18   THE COURT:  And do you know who that is?  Who

19   those were?

20   MR. GONZALEZ:  Are you referring to me?

21   THE COURT:  Well, probation or whoever knows that.

22   MR. GONZALEZ:  One of the witnesses is going to

23   testify that he was involved with the Mendoza brothers

24   three years prior to his arrest.  He was arrested in

25   2018, that would put it in 2015.

| | |
|---|---|
| 1 | THE COURT:  He was arrested in 2018? |
| 2 | MR. GONZALEZ:  2018. |
| 3 | THE COURT:  Okay. |
| 4 | MR. GONZALEZ:  So he was getting drugs from them |
| 5 | three years prior to that, that would be 2015. |
| 6 | THE COURT:  And you have a witness on that? |
| 7 | MR. GONZALEZ:  Yes, ma'am. |
| 8 | THE COURT:  Okay.  We'll hear that. |
| 9 | Okay.  And then you had something like delivered |
| 10 | heroin, not cocaine, and there was some typo. |
| 11 | MR. MULDER:  Yes. |
| 12 | THE COURT:  Okay. |
| 13 | MR. MULDER:  That was just a clarification. |
| 14 | THE COURT:  And then you seemed to think that |
| 15 | there was some condition where defendant didn't have |
| 16 | counsel or something. |
| 17 | MR. MULDER:  The Oklahoma conviction, whatever it |
| 18 | was, it was apparently some kind of unsupervised |
| 19 | probation for the paperwork.  But I haven't seen an |
| 20 | official judgment or anything, just a computer print out |
| 21 | to show that he was adjudicated -- |
| 22 | THE COURT:  Which paragraph number are we talking |
| 23 | about? |
| 24 | MR. MULDER:  52, Your Honor. |
| 25 | THE COURT:  52.  So I thought probation got more |

1   information on this.  It was verified online.

2   PROBATION OFFICER:  Right.  We went to online

3   records kept by the State of Oklahoma, and he was ordered

4   to pay a fine, along with court costs.

5   THE COURT:  I think it had to do with the problem

6   with counsel.

7   Did you say your defendant waived counsel?  Was

8   that in the records?

9   Look at paragraph 52 in the report.  I think the

10  objection was he didn't have counsel.  But I think -- and

11  it's 52, not 53, that you were complaining about.

12  MR. MULDER:  Judge, they are the same incident.

13  THE COURT:  It says defendant waived counsel on

14  both of those things.  And how did probation ascertain

15  that?

16  PROBATION OFFICER:  That would be from those

17  online records maintained by the State of Oklahoma.  No

18  official judgment was received.

19  MR. MULDER:  And, Judge, that's fine if the online

20  records say that.  I would like to see the official

21  judgment.

22  THE COURT:  If the online records say that, that's

23  what I would like to know, too.

24  PROBATION OFFICER:  I don't have them with me, but

25  if they waived counsel, otherwise I would put continued

1     representation is unknown.

2          THE COURT:  You had something that said they

3     waived counsel, but you don't have it with you?

4          PROBATION OFFICER:  Yes, ma'am.  I'm sorry.

5          THE COURT:  Can you get it?

6          PROBATION OFFICER:  Sure, if I can get to a

7     computer.

8          THE COURT:  Okay.  Why don't you go do that while

9     we have some of these proceedings.

10          PROBATION OFFICER:  Okay.  Thank you.

11          THE COURT:  Okay.  All right.  Well then

12     pending -- if that's the case, then I think that

13     objection is without merit and that is overruled.  And I

14     agree if the witness says -- places him in this

15     conspiracy in 2015, I think that is timely as well.  So I

16     overrule that.

17          Now that's subject to if there's more information

18     developed, I might change my mind.  But not from what I

19     see right now.  And we'll get that verification on the

20     online material.

21          MR. MULDER:  Okay.  Very well.

22          THE COURT:  Okay.  So we're really down to the

23     government's objection that -- the government's

24     maintaining that both of these individuals had a

25     leadership role of some sort in the conspiracy.  Is that

```
 1        the situation?
 2                MR. GONZALEZ:  It is, Your Honor.
 3                THE COURT:  Okay.  Do you want to go ahead and
 4        call your first witness then?
 5                MR. GONZALEZ:  The United States calls Special
 6        Agent Justin Marshall.
 7                THE CLERK:  Do you wear that the testimony you
 8        shall give in the case now on hearing shall be the truth,
 9        the whole truth, and nothing but the truth so help you
10        God.
11                THE WITNESS:  Yes, ma'am, I do.
12                MR. GONZALEZ:  May I proceed, Your Honor?
13                THE COURT:  Yes.
14                        JUSTIN MARSHALL,
15        after having been sworn, testified as follows:
16                        DIRECT EXAMINATION
17        BY MR. GONZALEZ:
18        Q      Sir, would you please state your full name for the
19        Court and the record.
20        A      Justin Marshall.
21        Q      How are you employed?
22        A      I'll a Special Agent with the United States
23        Department of Homeland Security --
24        Q      Go ahead.
25        A      -- Immigration and Customs Enforcement, Homeland
```

Security Investigations, currently assigned to Texoma HIDTA.

    Q      How long have you been so employed?

    A      A little over 22 years now.

    Q      And have you received any specialized training in regards to your duties?

    A      Yes, I have.

    Q      And can you summarize that training that you received.

    A      Since being employed, I completed the academy for Immigration and Nationality Service, it's a 21 week -- 16 week academy, followed by six weeks of Spanish.  And then since being on-the-job, I've been assigned to various groups that investigate various offenses in relation to Immigration Nationality Service and the United States Custom Service.

    Q      All right.  And so you received follow-up training after those particular academies that you attended?

    A      Yes, sir.

    Q      Okay.  And based -- what are your duties with HSI?

    A      Currently I'm assigned to Texoma HIDTA, where we actively investigate those individuals that are involved in a large-scale importation, production, distribution and transportation of drugs coming into the United States from foreign countries, and United States currency being repatriated into those countries where the drugs came from, and their source of supply.

1    Q    And did you have those same duties back in October

2  and prior to October of 2018?

3    A    Yes, sir.

4    Q    And have you had specialized training in the field

5  of investigating narcotics cases?

6    A    Yes, sir.  Mostly on-the-job training, but yes,

7  sir, I've been assigned to the narcotics group for a little

8  over 10 years now.

9    Q    All right.  Now in regards to narcotics

10  investigations, if you had to estimate the number of times

11  you've investigated narcotics violations, what would that

12  number be?

13    A    The number of individuals, or times?  I'm sorry.

14    Q    Let's start with times first.

15    A    I've been involved in investigations involving

16  hundreds of individuals involved in the importation and

17  production and transportation of narcotics from other

18  countries to the United States.

19    Q    And did those individuals that you investigated

20  and arrested, have you had an opportunity to speak to them?

21    A    Yes, I have.

22    Q    And have you been able to speak to them about

23  modes of operation, concealment methods, types of drugs and

24  things of that nature?

25    A    Yes, sir.

1      Q      Have you testified as a witness in federal and

2  state court before?

3      A      In federal court, yes, sir.

4      Q      How many times?  If you could give us a number.

5      A      Oh, numerous.  I would hate to put a number on it.

6  Probably 100 maybe, give or take.

7      Q      Okay.  Are you familiar with the duties of a lead

8  case agent?

9      A      Yes, sir, I am.

10     Q      And what are the duties?

11     A      So as a lead case agent you control the

12 investigation -- the aspects of the investigation as the

13 information comes in.  You assist or direct other

14 investigators or yourself in following the investigative trail

15 to lead you to a conclusion to identify those additional

16 individuals that are involved with the people you're actively

17 investigating.

18     Q      And were you one of the lead case agents involved

19 in the investigation of two individuals by the name of Daniel

20 Mendoza and Cristian Mendoza?

21     A      Yes, sir, I was.

22     Q      And do you see those individuals in the courtroom

23 today?

24     A      Yes, sir, I do.

25     Q      Would you point where they are seated and indicate

an article of clothing that they are wearing.

    A    Mr. Mendoza is in the gray -- I'm sorry, Daniel Mendoza is in the gray and black jumpsuit seated far to the right.  And Mr. Cristian Mendoza is in the white and black jumpsuit seated next to Mr. Mulder.

    MR. GONZALEZ:  Your Honor, may the record reflect that that the witness has identified Cristian Mendoza and Daniel Mendoza.

    THE COURT:  Yes, the record will so reflect.

    Q    (By Mr. Gonzalez) Now when did you begin investigating these two individuals?

    A    Around -- the investigation into the organization itself was April of 2018.

    Q    All right.  And what did your investigation reveal as to the defendants' involvement in trafficking of drugs?

    A    We learned about Mr. -- both Mendozas involvement around June, July of 2018.  They were identified as sources of supply for individuals that were coming from the Grayson County area and picking up methamphetamine.  They would be distributed to those individuals.  The individuals from the Grayson County area would go back for further redistribution of said methamphetamine, marijuana, and Xanax -- and heroin, sorry.

    Q    So this was a poly drug organization, correct?

    A    That's correct, sir.

1    Q    And have you prepared a power point to assist you

2  in your summary of your --

3         THE COURT:  You said that they would go back.

4    Where would they go back to?

5         THE WITNESS:  The Grayson County area.  Sherman/

6    Denison.

7         THE COURT:  But where were those people going?

8    From the Grayson County area, where did they go to get

9    these drugs?

10        THE WITNESS:  So they went to the Dallas area

11   where they were supplied drugs by the Mendozas.

12        THE COURT:  Okay.  Thank you.

13        THE WITNESS:  Yes.

14   Q    (By Mr. Gonzalez) Have you prepared a power point

15  to assist you in your summary of the investigation?

16   A    Yes, sir, I have.

17   Q    Can you turn to tab 1 there in the notebook in

18  front of you.

19   A    Yes, sir.

20   Q    What you're looking at has been previously marked

21  for identification purposes as Government's Exhibit 1.  Do you

22  recognize it?

23   A    Yes, sir.

24   Q    Has it been changed or altered in any way since it

25  was created?

```
 1        A       No, sir.

 2        Q       Does it truthfully and accurately depict what it

 3   purports to depict?

 4        A       Yes, sir.

 5        Q       And would it assist you in order for you to

 6   summarize this investigation for the Court?

 7        A       Yes, sir, it would.

 8                MR. GONZALEZ:  Your Honor, at this time we would

 9        offer Government's Exhibit 1 into evidence.

10                MR. MULDER:  No objection from Cristian Mendoza.

11                MR. JENKINS:  No objection from Daniel Mendoza.

12                THE COURT:  All right.  It's admitted.

13                MR. GONZALEZ:  May we publish?

14                THE COURT:  Yes.

15                MR. GONZALEZ:  Thank you.

16        Q       (By Mr. Gonzalez)  All right, agent.  Can you

17   summarize your investigation and your involvement?  How did it

18   begin and how did it lead you to identify these defendants and

19   surmise that it was being used in Grayson County as you just

20   testified.

21        A       Sure.  So initially this case is made up of three

22   different investigations that were combined in April of 2018.

23   Special Agent Joe Mata initiated an investigation in February

24   of 2018.  He initiated a case on an individual by the name of

25   Raul Gonzales.  In February of 2018, they purchased a kilogram
```

from Raul Gonzales in the Eastern District of Texas.  Through

subsequent investigation, Agent Mata was able to identify an

individual by the name of Emilio Santos, as the

methamphetamine source of supply for Raul Gonzales.

    Q    And that is Mr. Gonzales and that is Mr. Santos;

is that correct?

    A    That is correct, sir.

    Q    What happened next in the investigation?

    A    In January of 2018, HSI and FBI initiated an

investigation into Jesus Davila.  I was very familiar with

Mr. Davila, as we prosecuted him previously once for a cocaine

conspiracy case.  He was arrested -- I'm sorry, he was -- on

his original case, he was arrested.  He pled guilty, did his

time and was deported.  We received information that he had

returned to the United States and continued in the drug

distribution activities.

    We -- through the course of the investigation we

were able to identify Mr. Davila as a multi-kilogram

methamphetamine and coke and heroin source of supply,

receiving shipments of those drugs directly from Mexico.

    Mr. Davila utilized Mr. Santos to store and

distribute kilogram quantities of methamphetamine.

    Q    Okay.

    A    On May 22, 2018, we arrested Jesus Davila, and we

seized approximately $124,000 in drug proceeds, a Glock 17, 9

1    millimeter pistol, and a ledger from his residence.

2    On that same date, Emilio Santos was arrested and

3    agents seized approximately 11 kilograms of methamphetamine,

4    and approximately $48,000 in drug proceeds from Mr. Santos's

5    apartment.  And Mr. Santos's apartment, again, was identified

6    as a stash house location for Mr. Davila's operation.

7    Q    Okay.

8    A    On that same date we arrested three additional

9    individuals, Mario Lara Benito, Jesse Jacob Hernandez, and

10   Alexis Ivan Arellano.  Through their arrest we were able to

11   seize 30 kilograms of methamphetamine that was scheduled to be

12   delivered to Mr. Santos at the stash house apartment location.

13   So in June of 2018 is when we started hearing

14   about the Mendozas.  And an individual by the name of Jesus

15   Ordaz received kilogram quantities of methamphetamine and

16   heroin from Jesus Davila and/or Emilio Santos, who worked

17   directly for Davila, under the direction of Mr. Davila for

18   further distribution.

19   Ordaz also received kilogram quantities of

20   methamphetamine and heroin from Cristian Mendoza and Daniel

21   Mendoza for further distribution.

22   Ordaz was a methamphetamine source of supply for

23   Tim Billy, Justin Billy, and Tyton Hester, who further

24   distributed those drugs that they received from Ordaz, some

25   from Davila, some from the Mendozas in the Eastern District of

1  Texas.

2      Q      All right.  So Mr. Ordaz had multiple sources of

3  supply, which is not uncommon; is that right?

4      A      That's correct, sir.

5      Q      In this case he had Mr. Davila and Cristian

6  Mendoza and Daniel Mendoza as his sources of supply, correct?

7      A      That's correct, sir.

8      Q      And when you talk about Timothy Billy, Justin

9  Billy, and Tyton Hester, those are the individuals from

10  Grayson County that were receiving the drugs and distributing

11  the drugs in the Eastern District of Texas, correct?

12      A      That's correct, sir.

13      Q      All right.

14      A      Through the course of the investigation we were

15  able to identify an individual by the name of Roel Astran.  He

16  was identified as a methamphetamine customer of Jesus Ordaz.

17  Mr. Astran was identified as a methamphetamine and heroin

18  customer from -- for Cristian Mendoza and Daniel Mendoza, as

19  well.

20          Mr. Astran brokered methamphetamine sales between

21  Ordaz and Hester, and Mr. Astran brokered methamphetamine,

22  marijuana, heroin, cocaine, and Xanax sales between Cristian

23  Mendoza, Daniel Mendoza, and Tyton Hester.

24      Q      So basically Mr. Astran's role was that of a

25  middle man, correct?

1     A     That's correct, sir.

2     Q     So he would get the drugs -- the drugs that you've

3     identified, marijuana, heroin, cocaine and Xanax, from

4     Cristian Mendoza and Daniel Mendoza, and then deliver them to

5     Mr. Hester?

6     A     That's correct.

7     Q     And then distribute them in Grayson County?

8     A     That's correct, sir.

9     Q     All right.

10    A     The next name, Tyton Hester.  Hester was

11    identified as a Grayson County based methamphetamine source of

12    supply.  So Mr. Hester was coming to the Dallas, Texas area,

13    picking up Mr. Astran, who brokered the transactions between

14    Hester and Ordaz, and Hester and Cristian Mendoza and Daniel

15    Mendoza.

16          And this last page basically outlines the flow of

17    the drugs and the money, as well.  The source of supply

18    ultimately was individuals in Mexico.  Mr. Davila was in

19    direct contact with those individuals in Mexico.  He would

20    have kilogram quantities of cocaine and methamphetamine and

21    heroin sent to the Dallas, Texas area.  He -- throughout the

22    investigation he employed an individual by the name of Emilio

23    Santos.  Mr. Santos stored the narcotics and delivered the

24    narcotics at Mr. Davila's request.

25          Mr. Ordaz was receiving drugs from Mr. Davila, and

1     then later once Mr. Santos got employed by Mr. Davila, he was

2     receiving drugs directly from Mr. Santos, as well.

3            Mr. Ordaz also in addition was receiving drugs

4     from Mr. Davila, and Mr. Santos received drugs from Cristian

5     and Daniel Mendoza.  Those drugs from both those sources of

6     supply were brokered through Roel Astran, or the middle man

7     through Roel Astran, that went to Tyton Hester for further

8     distribution in the Grayson County area.

9            Mr. Ordaz also gave those drugs to Justin and

10     Timothy Billy, who were also further distributing in the

11     Grayson County area.

12     Q     Now in regards to -- or focusing in on the Mendoza

13     brothers.  Did you -- or did your investigation reveal that

14     they were partners in the distribution of these different

15     types of drugs?

16     A     Yes, sir.  That is the information we have.

17     Q     And you had several cooperators come forward and

18     cooperate in this investigation, correct?

19     A     That's correct.  Multiple cooperating defendants

20     identifying Cristian and Daniel Mendoza as partners in their

21     drug business.

22     Q     And what quantities of drugs were they

23     distributing in both heroin and methamphetamine?  Did those

24     cooperators indicate?

25     A     Anywhere from grams to kilograms.

1    Q    Okay. And in total, it would be hundreds of

2 kilos?

3    A    I wouldn't say hundreds, but it was -- it was less

4 than 100, but it was probably more than 25.

5    Q    All right. And at some point did you become aware

6 of locations that were being used by Cristian Mendoza and

7 Daniel Mendoza to distribute the drugs?

8    A    Yes, sir. Through the use of cooperating

9 information we were able to identify three locations that the

10 Mendozas had utilized as stash house locations.

11    Q    Now what do you mean by stash house locations?

12    A    It's a location utilized to store and distribute

13 the drugs. So a lot of times they don't want to do it from

14 their home to draw attention to themselves, so they will

15 choose a location -- usually not too far away, but within

16 close proximity so they can keep an eye on it, it's easy for

17 them to go to and come from, where they will have their

18 workers or other individuals that are there distribute the

19 drugs and collect the drug proceeds.

20    Q    And what did cooperators specifically tell you

21 about those locations where -- is that exactly where they

22 picked up the drugs?

23    A    That is correct, sir.

24    Q    And was it pursuant to a phone call to either

25 Cristian Mendoza or Daniel Mendoza that the drugs were picked

1  up there?

2     A     That's correct, sir.

3     Q     So after the phone call requesting drugs, then

4  they would be directed at times to the apartment or the stash

5  house?

6     A     That's correct.  There were times that they also

7  went to their residence on Wyoming, as well.  But the majority

8  of the time it was the stash house location.

9     Q     And where were the three houses located?

10    A     It was an apartment on East in Dallas, Texas.

11 There was a rental property on Wood Valley in Dallas, Texas,

12 and then the last location was the apartment 281 at 2704

13 Cockerill Hill, 218, in Dallas, Texas.

14    Q     And were any of these apartments or locations

15 registered in the name of Cristian or Daniel Mendoza?

16    A     I do not know about the first two, but I can tell

17 you that the last one was not.  No, sir.

18    Q     And based on your training and experience in this

19 investigation, is that unusual?

20    A     No, sir, not at all.

21    Q     Why is it not unusual?

22    A     In order to avoid detection by law enforcement,

23 individuals likely do not put things in their name.  So for

24 example, when we served -- we executed a search warrant at

25 2704 Cockerill Hill, Number 281.  The lease was not in either

1    Cristian or Daniel's name.

2         Q       And did you find out whose name it was in?

3         A       Yes, sir, we did.

4         Q       And did you interview that person?

5         A       I did not, but Special Agent Mata did.  Yes, sir.

6         Q       What did that person say in regards to leasing

7    that particular apartment?

8         A       She advised that her credit was poor, and that she

9    couldn't do it.  However, she was -- let me back up.  She was

10   approached by Cristian Mendoza and asked to lease the

11   apartment in her name for it to be utilized.  She -- initially

12   she stated she wouldn't be able to because she had poor

13   credit.  Subsequently, she agreed to do so once Mr. Cristian

14   Mendoza said that he would pay for it and pay the rent

15   utilizing it in her name.

16        Q       And at some point in your investigation did you

17   intend to do a controlled purchase at that particular

18   apartment that you just mentioned?

19        A       Yes, sir, I did.

20        Q       Can you describe what occurred on that particular

21   occasion?

22        A       Yes, sir.  On October 23, 2018, we purchased five

23   grams of black tar heroin from 2704 Cockerill Hill, Number 281

24   in Dallas, Texas.

25        Q       And that was the apartment that had been

1  identified by the cooperators as the stash house operated by
2  the defendant, correct?
3       A      Correct.  By multiple cooperators, yes.
4       Q      Okay.  And tell us how that went down. How that
5  particular operation occurred, and what happened.
6       A      So we initiated some telephone calls with Cristian
7  Mendoza, also known as Little Sugar or Sugar.  Through those
8  consensually recorded calls, some other calls were placed to
9  trap house -- the operators of the trap house who worked
10 directly for the Mendozas.  A gentleman by the name of
11 Christian Sorto-Villatoro and another gentleman by the name of
12 Elias Mendoza were at the stash house that day when we
13 purchased the five grams of heroin.
14            Through the telephone calls, Cristian Mendoza
15 directs the individuals to go to the apartment to pick up the
16 heroin.  We subsequently go to the apartment, try to purchase
17 the heroin, but the heroin was not there.  The cooperating
18 defendant leaves.  There's further conversation indicating
19 that they have to go get the heroin.  They say that they are
20 going to go get the heroin from Trigger's house, which we know
21 to be -- which we know to be 4581 Wyoming in Dallas, Texas.
22            We follow Elias Mendoza over to 4581 Wyoming in
23 Dallas, Texas.  Turns around, goes inside, turns around and
24 comes back to the apartment at 281 Cockerill Hill.  And then
25 subsequent conversation, they have the heroin, cooperating

        1    defendant goes there.  We purchase the five grams of black tar
        2    heroin.
        3        Q      And to your knowledge who lives at that address on
        4    Wyoming?
        5        A      Both Cristian Mendoza and Daniel Mendoza, along
        6    with Cristian's spouse Veronica, and their grandmother.
        7        Q      So that was the residence that the individuals
        8    that were running the stash house went to receive the heroin
        9    that had been requested?
       10        A      Yes, sir.
       11        Q      And were those phone calls recorded?
       12        A      Yes, sir, they were.
       13        Q      I'll have you look at Government's Exhibit 2
       14    through 5 there in the notebook in front of you.
       15        A      Yes, sir.
       16        Q      Do you recognize Defendant's Exhibit 2 through 5
       17    in the notebook?
       18        A      I would have to listen to them.  They are disks,
       19    but they going to be the calls.
       20        Q      I'm sorry.  I said 2 through 5, but it's actually
       21    2A, 2B, 2C, and 2D.
       22        A      Correct.
       23        Q      And have you listened to those calls?
       24        A      Yes, sir, I have.
       25        Q      Have they been changed or altered in any way?

1       A       No, sir, they haven't.

2       Q       Was the device used to record the calls capable of

3  accurately and truthfully recording the conversations?

4       A       Yes, sir, it was.

5       Q       And you identified the voices contained therein?

6       A       Yes.  On the calls they self-identify who they

7  are.

8              MR. GONZALEZ:  Your Honor, at this time we would

9       offer Government's Exhibits 2A, 2B, 2C, and 2D into

10      evidence.

11             MR. MULDER:  No objection to 2A through 2D from

12      Cristian Mendoza.

13             MR. JENKINS:  No objection from Daniel Mendoza,

14      Your Honor.

15             THE COURT:  All right.  Those are admitted.

16             MR. GONZALEZ:  And may we publish?

17             THE COURT:  Yes.

18                 (Exhibit played in open court)

19      Q       (By Mr. Gonzalez)  And who is on that

20  conversation?

21      A       That is a call by Roel Astran to Cristian Mendoza

22  requesting two grams of black tar heroin.

23      Q       And then in that call they refer to "meet you at

24  the spot." What do you know that to be?

25      A       The spot was identified as the Apartment on 2704

1 Cockerill Hill Road in Dallas, Texas. The stash house

2 maintained by both Cristian Mendoza and Daniel Mendoza.

3         THE COURT: All right. Go to 2B, please.

4             (Exhibit played in open court)

5     Q     (By Mr. Gonzalez) Can you summarize that call for

6 us.

7     A     That is the call with Roel Astran calling the spot

8 or the stash house. The phone was answered, he asked for Big

9 C. Big C is known as Christian Sorto-Villatoro. Then the

10 individual gets on the phone and identifies himself. It's

11 hard to understand, but I believe he says E-Money or E. That's

12 going to be Elias Mendoza. Then Mr. Astran is requesting the

13 five grams or two grams, I don't remember. You can play the

14 call back if you want and I can tell you the amount he said.

15 He's requesting gram quantities of black tar heroin.

16     Q     I believe it was five.

17     A     I know the first call said five, I don't remember

18 the second call.

19         MR. GONZALEZ: All right. If you would go to the

20     next one, please.

21             (Exhibit played in open court)

22     Q     (By Mr. Gonzalez) What's going on there in that

23 conversation?

24     A     That's a call with Mr. Astran and Elias Mendoza

25 where --

1      Q     He was talking to C on that occasion.

2      A     Would you mind playing it again?

3      Q     Sure.

4      (Exhibit played once again in open court)

5      Q     (By Mr. Gonzalez) I stand corrected.  So what was

6 the nature of that call?

7      A     He was inquiring about the price for the five

8 grams of black tar heroin.  $300 was the negotiated price.

9      Q     Okay.  And then he asked whether he has it there,

10 right?

11      A     That's correct, sir.

12      Q     And he said you have to get it from Trigger?

13      A     Mr. Astran said he had to go get it.  He indicated

14 that he was going to go get it, and it was going to take him

15 18 to 20 minutes.

16      Q     Get it from Trigger?

17      A     That's correct.

18      Q     And you know Trigger to be?

19      A     Cristian Mendoza.

20      Q     Okay.

21      MR. GONZALEZ:  Next call, please.

22        (Exhibit played in open court)

23      Q   (By Mr. Gonzalez) And can you summarize

24 that call.

25      A     It was a call between Roel Astran and Big C, also

known as Christian Sorto-Villatoro, where he was asking if
they had picked up the five grams of black tar heroin.  If
Mr. Elias Mendoza, also known as E, had picked up the five
grams of black tar heroin.

Q      All right.  Let me have you look at Government's
Exhibit 7 and 8 for identification purposes, and see if you
recognize Government's Exhibits 7 and 8.

A      Yes, sir.

Q      And do they truthfully and accurately depict pick
what they purport to depict?

A      Yes, sir.

Q      Have they been changed or altered in any way?

A      No, sir, not to my knowledge.

MR. GONZALEZ:  Your Honor, we would offer
Government's Exhibit 7 and 8 into evidence.

MR. MULDER:  No objection to 7 or 8 from Cristian
Mendoza.

MR. JENKINS:  No objection from Daniel Mendoza.

THE COURT:  Those are admitted.

MR. GONZALEZ:  May we publish?

THE COURT:  Yes.

Q      (By Mr. Gonzalez) And what's depicted
there on the screen?

A      That's Elias Mendoza, also known as E.

Q      So that's one of the individuals that was on the

1  conversations?

2       A      Yes, sir.

3       Q      Also indicted as a coconspirator, a defendant in

4  this case?

5       A      That's correct.  Yes.

6              MR. GONZALEZ:  And if we could go to Exhibit 8,

7       please.

8       Q      (By Mr. Gonzalez) And what's depicted there?

9       A      That is Christian Sorto-Villatoro.

10      Q      And is that the same individual that's being

11 referred to as Big C?

12      A      He's known as Big C, yes.

13      Q      So that's the same person on the recorded

14 conversation, correct?

15      A      That is correct, yes.

16      Q      Also a co-conspirator, co-defendant in this

17 particular case?

18      A      That is correct, sir.

19      Q      And what was their role in this investigation or

20 this case?

21      A      They maintained the stash house for Cristian and

22 Daniel Mendoza, delivering the drugs and collecting drug

23 proceeds.

24      Q      And is that the location where individuals from

25 Sherman would come to -- or the middle man for the individuals

1  in Sherman would come to, to receive the different types of

2  drugs?  Be it heroin, methamphetamine, pills, or marijuana, as

3  you indicated previously?

4       A       Yes, sir.  They would go to the Mendoza stash

5  house locations.

6       Q       All right.  Now did eventually this operation lead

7  to the purchase of the drugs?

8       A       Yes, sir, it did.

9       Q       And describe that.

10      A       Like I said, the first time we went, it was not

11  there.  They had to go get it.  We subsequently followed Elias

12  Mendoza to 4581 Wyoming.  He returned back to the apartment.

13  We went back and made the purchase of five grams of heroin for

14  $300.

15      Q       And this was on October 3rd?

16      A       Yes, sir, that is correct.

17      Q       And was the cooperating individual wearing a

18  recording device?  Any kind of video or audio recording

19  device?

20      A       Yes, sir.  He was wearing both.

21      Q       And was that device functioning as normal and

22  capable of recording accurately?

23      A       Yes, sir, it was.

24      Q       Have you reviewed that particular recording?

25      A       Yes, sir, I have.

1    Q    Has it been changed or altered in any way?

2    A    No, sir, not to my knowledge.

3    Q    And can you identify the voices contained therein?

4    A    Yes, sir.

5    MR. GONZALEZ:  Your Honor, at this time we would

6    offer Government's Exhibit 3 into evidence.

7    MR. MULDER:  No objection from Cristian Mendoza.

8    MR. JENKINS:  No objection from Daniel Mendoza.

9    THE COURT:  It's admitted.

10    MR. GONZALEZ:  May we publish?

11    THE COURT:  Yes.

12    MR. GONZALEZ:  Your Honor, can we have the lights

13    turned down just a bit?

14    THE COURT:  Yes.  It's very hard to see.

15    (Exhibit played in open court)

16    Q    (By Mr. Gonzalez) And timewise in context,

17    when did this recording take place?  Before the

18    drugs made it back to the apartment over from

19    Wyoming?

20    A    That's correct, sir.  That was our first attempt

21    to make the purchase.

22    Q    Okay.  And then after you witnessed them go to

23    Wyoming, were you able to buy the heroin that you were looking

24    for?

25    A    Yes, sir, we did.

1     Q     Okay.  Now after conducting this buy operation did

2  your investigation continue?

3     A     Yes, sir, it did.

4     Q     What happened next?  Did you obtain any search

5  warrant or anything of that nature?

6     A     Yes, sir.  On October 9, 2018, we executed a

7  search warrant at the stash house location at 2704 Cockerill

8  Hill, Number 281, Dallas, Texas.  After we finished the search

9  warrant at the stash house location, we went to 4581 Wyoming,

10  Dallas, Texas, and executed a search warrant at that location

11  as well.

12     Q     All right.  And when you say you conducted a

13  search at 2704 Cockerill Hill Road, Apartment 281, that was

14  the same apartment that we just saw in the video?

15     A     That is correct, sir.

16     Q     And the individuals that were on the video, did

17  you make out who they were?

18     A     Two of the individuals, not all four.

19     Q     Who were the two that you recognized?

20     A     The gentleman counting the U.S. currency is

21  Christian Sorto-Villatoro.  And the other individual in the

22  green shorts is Elias Mendoza.

23     Q     The same individuals that were in the recordings

24  that we just heard?

25     A     That's correct, sir.

         Q       And when you did the search at the apartment on
Cockerill Hill Road, did you take any photographs?

         A       Yes, sir.

         Q       I'll have you look at Government's Exhibit 4 in
the notebook in front of you.

         A       Yes, sir.

         Q       And do you recognize Government's Exhibit 4?

         A       Yes, sir.

         Q       Has it been changed or altered in any way since it
was created?

         A       No, sir.

         Q       And does it truthfully and accurately depict what
it purports to depict?

         A       Yes, sir.

              MR. GONZALEZ:  Your Honor, at this time we would
         offer Government's Exhibit 4 into evidence.

              MR. MULDER:  No objection to the photographs in
         Exhibit 4.

              MR. JENKINS:  No objection from Daniel Mendoza,
         Your Honor.

              THE COURT:  All right.  It's admitted.

              MR. GONZALEZ:  May we publish?

              THE COURT:  Yes.

         Q       (By Mr. Gonzalez)  And what's depicted there?

         A       The front door of the apartment, the actual

1  number.

2      Q      And what's depicted there?

3      A      As you enter the living room it's to the right.

4  It's the living room.

5      Q      And this apartment is sparsely -- there's hardly

6  any furniture, is that correct, in this apartment?

7      A      That's correct.  There are those two chairs there.

8  There's another chair off to your left you'll see in a minute,

9  and then there's two mattresses in a bedroom that do not have

10  any bedding on them, laying on the floor.

11      Q      Next photo, please.

12      A      This is the dining room, for lack of a dining room

13  table, area there to your left.  And to the right of the

14  picture is the bathroom of the apartment.

15      Q      Next photo.

16      A      From the dining room looking into the kitchen

17  there's a stove.

18      Q      Is that the same stove that was seen where he was

19  counting the money?

20      A      Correct.  And you can see the U.S. currency there

21  laying on top of the stove.

22      Q      Next photo, please.

23      A      So you see the U.S. currency there, and then right

24  beside the U.S. currency is user quantity of black tar heroin,

25  in the small -- I think it's pink or orange bag.

1    Q    Next photo.

2    A    Telephone on the counter next to the fridge.

3    Q    What did your cooperating defendants tell you

4 about the phone there at the house?

5    A    That that phone goes to the trap house -- I'm

6 sorry, the stash house location.

7    Q    And for what purpose?

8    A    So the customers can maintain contact with the

9 individuals that are currently in the stash house location

10 when they need to purchase quantities of drugs.

11    Q    Next photo.

12    A    So you see another phone, two different scales,

13 the orange is a scale, and then the black is a scale as well.

14 A phone.  You see a razor on a plate with residue of black tar

15 heroin, and you see a torch there lying next to the sink right

16 there, and then you see a hypodermic needle as well, all used

17 to inject black tar heroin into the body.

18    Q    We have a close-up of the substance and the money

19 that was on the stove?

20    A    That is correct, sir.

21    Q    And you indicated that is a street level quantity

22 of heroin, correct?

23    A    Yes, sir.

24    Q    Next photo.

25    A    Pictures of Ziplocks on the counter used to seal

the drugs with, hold them for distribution.  The rubber bands
at the top are used for -- to put around money, usually to
count in increments of $1,000 or more, depending on what the
denomination is, to keep the money nice and neat.  So
whenever -- it's easier to count whenever it's passed back to
the source of supply in Mexico.

You could actually see Big C with money in his
hand on the video, reaching into his pocket.  I believe he was
looking for a rubber band so that he could put that stack of
probably $1,000 together without having to recount it again.

Q      Next photo.

A      Same thing with the scale and the residue on it,
and the cell phone, as well.

Q      Next photo.

A      Backpack that was in the kitchen.  The green that
you see in the bottom of the screen is what we believe to be
Xanax.

Q      So the items that you were finding, were
consistent with the information that you had been provided
that this was a stash location for the Mendoza brothers?

A      That's correct, yes.

Q      And the items that you were finding, such as pills
and heroin and those items, were consistent, as well?

A      Initially, yes, sir.  And we have some subsequent
photos that we found marijuana and methamphetamine, as well.

1    Q      Okay.  Next photo, please.

2    A      Just another shot of the Xanax pills.

3    Q      Next.

4    A      That is the bedroom of the apartment.  As you can

5    see, it's -- there's no sheets, just a pillow and a mattress.

6    Q      Next.

7    A      Close-up of the Xanax pills with some U.S.

8    currency with them.

9    Q      And obviously that currency is wrapped in those

10   rubber bands as you indicated, correct?

11   A      Yes.

12   Q      Next photo.

13   A      In that green bag -- in the main pocket of the

14   green bag there was a yellow bag that contained marijuana and

15   U.S. currency.

16   Q      Next.

17   A      Just a close-up of that bag once it was opened.

18   Again, the rubber band wrapping the U.S. currency and

19   marijuana.

20   Q      Next photo, please.

21   A      Same thing.

22   Q      Next.  Again, that counter or that table, correct?

23   A      Correct.  So they would take the heroin, put it on

24   the plate, cut it with a razor and then weigh it on the scale.

25   And you saw the residue on the scale.  And bag it up and sell

1    whatever quantity was ordered.

2        Q    Next photo.

3        A    Can you go back one photo?  I'm sorry.

4        Q    Okay.

5        A    Thank you.

6        Q    So this was -- go ahead and go to the next photo,

7    next slide.

8             So this potato chip bag was there on the counter

9    and it contained some money?

10       A    Correct.  Some Xanax pills and money.

11       Q    Okay.  Next photo.  And that's looking inside the

12   bag; is that correct?

13       A    That is a bag -- a different potato chip bag that

14   was found to contain marijuana.

15       Q    Next photo.

16       A    The chip bag with the marijuana.

17       Q    Okay.

18       A    Same thing.

19       Q    And what is that?

20       A    It was a notebook that we believe was utilized as

21   a ledger, with probably dollar amounts that were paid over on

22   the right hand side.

23       Q    Next.

24       A    Same thing.

25       Q    So obviously there was some keeping track of what

1    was being paid and what was being handed out, correct?

2        A        Correct.  So for example, on this picture half a

3    gram, $40; a gram, $80; and one and a half grams, $90; 3.1,

4    grams, 150.

5        Q        If we can go to 4029, please.  And what's shown

6    there.

7        A        That's plastic utilized to -- commonly used to

8    wrap narcotics that are stored and/or transported.

9        Q        Particularly for larger quantities, correct?

10       A        That's correct.

11       Q        4030, please.

12       A        Those were -- or that is again user quantity of

13   heroin that was found on the floor.

14       Q        And 4031.

15       A        A close-up of the heroin bags already packaged for

16   sale.

17       Q        And 4034, please.

18       A        We opened the refrigerator up, where we found in

19   the refrigerator marijuana brownies in a bag.

20       Q        4035, please.  What's depicted there?

21       A        A Nike box.

22       Q        4036.

23       A        We opened up -- the Nike box had a yellow bag.

24   And the next picture I believe shows the brownies that tested

25   for THC.

1    Q    And the next photo.

2    A    Correct.

3    Q    And then 4039, please.

4    A    So as we went into the apartment -- after knocking

5    and announcing our presence, Alejandro Flores who was

6    encountered inside the apartment came outside of the kitchen

7    and dining room area in plain view.  You can see there U.S.

8    currency and a -- what appears to be a pistol, or what is a

9    pistol there that had been thrown in the trash.

10    Q    Let's go to 4030, please.  And is that a close-up

11    of the firearm?

12    A    That is correct, sir.

13    Q    All right.

14    A    Bag of heroin also that was there.

15    Q    4042, please.  And what's depicted there?

16    A    The handgun within the trash.  They were in the

17    process of making it safe to show that it was loaded.

18    Q    And based on your training and experience is it

19    common to find firearms in close proximity to drugs at a stash

20    house?

21    A    Yes, sir.  More often than not.

22    Q    And why would that be?

23    A    They are utilized for the protection of the drugs

24    themselves and the drug proceeds, so they are not ripped off

25    or robbed.

1     Q     And are they considered tools of the trade?

2     A     Yes, sir.

3     Q     Okay.  And 4044, please.

4     A     Just a close-up of the pistol.

5     Q     And the firearm was loaded, correct?

6     A     That's correct.

7     Q     4047.

8     A     So that is a white box that was in the trash as
9 well with U.S. currency that was wrapped in rubber bands and a
10 small amount of methamphetamine there in the white plastic bag
11 with the U.S. currency.

12     Q     4049.

13     A     Black tar heroin in a plastic bag that was in the
14 trash, as well.

15     Q     4052.

16     A     So taking the items out of the trash and putting
17 them on the counter to see what it is, the silver thing is a
18 grinder used to grind up the marijuana.  U.S. currency, black
19 tar heroin in the bags.  The bags themselves that are used to
20 put the heroin in, the U.S. currency and the methamphetamine.

21     Q     Okay.  4054.

22     A     That is a test kit.  THC test kit that we
23 performed on the brownies.

24     Q     4054.

25     A     Bullets that were in a drawer in the kitchen.

1      Q      All right.  So those are the photographs from the

2  apartment that have been identified to you as a stash house

3  for the defendants.  You indicated that you did another search

4  at a different location, correct?

5      A      Yes, sir.  Immediately thereafter we traveled to

6  4581 Wyoming in Dallas, Texas, which is just a couple minute

7  drive, and executed a state search warrant and the arrest

8  warrant for Cristian Mendoza.

9      Q      And was that based on -- or partly based on what

10 you had seen that day when you were making your purchase where

11 an individual left the apartment and went over to that address

12 on Wyoming?  4581 Wyoming?

13     A      Yes, sir.

14     Q      And you obtained a search warrant, and did you

15 search that residence?

16     A      Yes, sir, I did.

17     Q      And like you did here, did you take photographs at

18 that residence?

19     A      Yes, sir, I -- we did.

20     Q      Can you look at Government's Exhibit 5 in the

21 notebook there in front of you.

22     A      Yes, sir.

23     Q      And do you recognize Government's Exhibit 5?

24     A      Yes, sir.  Those are photographs from the search

25 warrant.

1    Q     And has Government's Exhibit 5 been changed or
2    altered in any way since it was created?

3    A     No, sir.

4    Q     And do they truthfully and accurately purport what
5    they purport to depict?

6    A     Yes, sir.

7          MR. GONZALEZ:  Your Honor, at this time we offer
8          Government's Exhibit 5 into evidence.

9          MR. MULDER:  No objection to the photos in Exhibit
10         5 for Cristian Mendoza.

11         MR. JENKINS:  No objection from Daniel Mendoza.

12         THE COURT:  All right.  Those are admitted.

13         MR. GONZALEZ:  May we publish?

14         THE COURT:  Yes.

15   Q     (By Mr. Gonzalez)  And who was found at that
16   particular location?

17   A     At the location that day were Cristian and Daniel
18   Mendoza, their grandmother, Veronica, Cristian's wife, and
19   their daughter.

20   Q     And what items did you find that had any
21   evidentiary value?

22   A     From the search warrant that day we recovered
23   marijuana, money counter, heroin, scales, U.S. currency,
24   ledger, pistol, scale -- did I say scale already?

25   Q     So you found similar items to that that were found

1  in the apartment?

2      A      That's correct.

3      Q      Let's go to Government's Exhibit 5001, please.

4  And what's depicted there?

5      A      That is a picture from Wyoming, looking at the

6  front of the house.

7      Q      Next slide.

8      A      The Nissan known to be driven by Daniel Mendoza,

9  and in front of it is the Tahoe known to be driven by Cristian

10  Mendoza.

11      Q      And those individuals have been identified by the

12  cooperating defendants, used by these individuals when they

13  were involved in the distribution of drugs?

14      A      Yes, sir.

15      Q      Okay.  Next photo.

16      A      The front of the residence.

17      Q      Next.

18      A      The front door of the residence with a police car

19  gate or bar, if you will.

20      Q      Let's speed up things a little bit.  Let's go to

21  5007, please.

22      A      That is -- I'm sorry.

23      Q      Do you recognize that picture?

24      A      Yes, sir.  That's Daniel Mendoza's room.

25      Q      Next photo.  Same thing?

1    A    Correct.

2    Q    5010.

3    A    Same thing.

4    Q    And what was found in this particular room?

5    A    U.S. currency and a pistol.

6    Q    Next photo.  And what's depicted there?

7    A    That is the kitchen.  So the previous photo I

8  believe was the room of Cristian Mendoza.  I apologize.

9  There's another photo subsequent to that that's going to clear

10 that up.  But this is the kitchen going into the garage.

11    Q    So let me go back to 5010.

12    A    I believe that's the dresser in Cristian Mendoza's

13 room.

14    Q    All right.  Now you indicated that in the photo of

15 5011 that that is the kitchen going into the garage, correct?

16    A    Correct.

17    Q    Did you search the garage?

18    A    Yes, sir, we did.

19    Q    What items of value did you find in the garage?

20    A    There was a scale with black tar residue there in

21 the garage.  There was a backpack that also had bags that

22 contained marijuana in the garage, and a knife that they were

23 utilizing to cut up the black tar heroin and weigh it.

24    Q    Let me go to 5012, please.  What is depicted

25 there?

1      A      That's the scale in the garage.  And you can see
2  the backpack, yes, sir.  And the backpack is next to it.  The
3  orange backpack.

4      Q      All right.  Next photo.  What's depicted there?

5      A      A knife that was found there that had black tar
6  heroin residue on it, as well.  And you can see the black tar
7  residue on the scale.

8      Q      Next photo.

9      A      It's a black bag found to contain marijuana.

10     Q      Next.

11     A      Close up of the scale with the residue.

12     Q      Next, please.

13     A      Close up of the knife with the residue.

14     Q      Next photo.

15     A      That is a picture of Cristian Mendoza that was in
16  the living room of the residence.

17     Q      Counting large sums of money, correct?

18     A      That's correct.

19     Q      If we go to 5019, please.  And what's depicted
20  there?

21     A      That is the dresser that is in Daniel Mendoza's
22  room.  It's kind of blurry, but in those plastic bags are
23  black tar heroin.

24     Q      What's in the next photo?

25     A      It's the same picture with a light.  You can see

1    his wallet there, and then the small amounts of black tar
2    heroin along with the sandwich bags.
3         Q      Along with some ammo here?
4         A      Correct.  In the bottom corner box, that's
5    correct.
6         Q      Next photo.  Actually, let -- why don't we go to
7    5022.  That's a clearer photo.  What's depicted there?
8         A      Ammunition, and the heroin that was -- the heroin
9    had been taken out and the wallet had been taken out, so you
10   can see the heroin there on top of the sandwich bags and then
11   ammunition in the bottom of the box.
12        Q      Next photo.
13        A      The wallet contained Daniel Mendoza's Texas ID.
14        Q      Next photo.
15        A      One of the drawers contained Manitol, which is a
16   substance known to utilize to cut the heroin so it's not as
17   strong and it goes further.
18        Q      So it will be something that you were using in the
19   distribution of heroin, correct?
20        A      That's correct.
21        Q      Next photo.
22        A      Drawer in his room containing U.S. currency.
23        Q      Can we go to 5027, please.  What's depicted there?
24        A      It's a shoe box that was at the foot of his bed
25   that contained black tar heroin.

 1       Q       Let's go to 5029, please.

 2       A       Heroin on the scale showing the weight of that

 3    bag.

 4       Q       All right.  And there were multiple, multiple bags

 5    containing that quantity of heroin, correct?

 6       A       That's correct.

 7       Q       And if we can go to 5031, please.  And what is

 8    that?

 9       A       That is a pistol box that was found behind

10    Cristian Mendoza's bed in his bedroom.

11       Q       And 5033, please.

12       A       That's the pistol with the ammunition in the bag

13    that was -- once that box had been opened, that was behind his

14    bed.

15       Q       And then 5034.

16       A       The pistol.  Same pistol.

17       Q       And that same concept, drugs were in the house, so

18    it wouldn't be unusual for you to find drugs near, or

19    approximate to drugs and money, and the proceeds were to sell

20    the drugs?

21       A       That's correct.  Cristian Mendoza had U.S.

22    currency and a firearm in his room, and then Daniel Mendoza

23    had the heroin in his room.

24       Q       5037, please.

25       A       U.S. currency in the drawer.

1     Q    5038.

2     A    U.S. currency in the safe there in Cristian

3 Mendoza's room.

4     Q    5039.

5     A    The currency from the safe.

6     Q    5040.

7     A    A picture of Cristian and somebody else there.

8 It's hard to make out, but that is a ledger, as well.

9         MR. GONZALEZ:  If we can zoom in on this area

10    right here, please.

11    A    (By the Witness)  So it says debt, and then J's,

12 24-5.  I believe J's is going to be Dollar Jay, also known as

13 Jesus Ordaz.  And then you see E over there.  That's going to

14 be Elias Mendoza.

15    Q    Okay.  Actually the next photo is clearer.  5041.

16    A    Same.

17    Q    And that's the same one that we were looking at?

18    A    Correct.

19    Q    5042.

20    A    Shoes containing the magazine in Daniel Mendoza's

21 room.

22    Q    5043.

23    A    The magazine outside the shoe was loaded, but we

24 did not find the firearm that it went to at that residence

25 that day.

1    Q    Other than the one that was indicated or shown
2 before, correct?
3    A    The only firearm we found was the one from before
4 that was in Cristian Mendoza's room.  That's correct.
5    Q    5044.
6    A    Marijuana in the backpack in the garage, along
7 with the scale and the knife.
8    Q    Now you talked about the two individuals,
9 Christian Sorto-Villatoro, Big C, and Elias Mendoza being
10 workers for Daniel and Cristian Mendoza, correct?
11    A    Yes, sir.
12    Q    Did you -- were you able to identify any other
13 workers for the Mendozas?
14    A    Yes, sir.
15    Q    And who was that?
16    A    A gentleman by the name of Jeovany Aguilar, also
17 known as Bullet.
18    Q    If we can go -- go to Government's Exhibit 6 in
19 the notebook there in front of you.
20    A    Yes, sir.
21    Q    Do you recognize Government's Exhibit 6?
22    A    Yes, sir.
23    Q    Does it truthfully and accurately depict what it
24 purports to depict?
25    A    Yes, sir, it does.

 1     Q     Has it been changed or altered in any way?

 2     A     No, sir.

 3           MR. GONZALEZ:  Your Honor, at this time we offer

 4     Government's Exhibit 6 into evidence.

 5           MR. MULDER:  No objection from Cristian Mendoza as

 6     to 6.

 7           MR. JENKINS:  No objection from Daniel Mendoza,

 8     Your Honor.

 9           THE COURT:  It's admitted.

10           MR. GONZALEZ:  And may we publish?

11           THE COURT:  Yes.

12     Q     (By Mr. Gonzalez)  What is depicted there on the

13     screen?

14     A     It's Jeovany Aguilar, also known as Bullet.

15     Q     And how did he get involved with the defendants?

16     A     He assisted in the sale and distribution of the

17     drugs from the stash house that was maintained by the

18     Mendozas.

19     Q     So he was another individual that was identified

20     as operating the stash house, much like the other two that

21     you've previously identified?

22     A     Yes, sir.

23     Q     Now are you aware if either Cristian Mendoza or

24     Daniel Mendoza belonged to any kind of gang?

25     A     Yes, sir.  The information indicates that they

1    were part of the Familia Home Boys, also known as FHB Dallas.

2        Q    And to your knowledge are they involved in drug

3    distribution?

4        A    Yes, sir.

5        Q    Now at some point you made contact with Daniel

6    Mendoza and you attempted to obtain -- strike that.

7            At the time of his arrest at the house on Wyoming

8    did Daniel Mendoza make any statements?

9        A    Yes, sir.  I was not there, but he was Mirandized

10   by Special Agent Mata, agreed to speak and said the heroin at

11   the house, along with everything else at the house, was his.

12       Q    So he admitted to being a heroin dealer, correct?

13       A    Yes, sir.

14       Q    And admitted to the firearms and everything else

15   that was there?

16       A    Yes, sir.

17       Q    All right.  Now at some point after that, after

18   that particular comment at the time of his arrest did you have

19   any contact with Daniel Mendoza?

20       A    Yes, sir.

21       Q    Did he agree to do a proffer interview?

22       A    Yes, sir.

23       Q    And did you and I and other agents meet with

24   Daniel Mendoza and his attorney?

25       A    Yes, sir.

1      Q      And was he given a proffer letter to renew with
2  his attorney in order to conduct a proffer interview?
3      A      Yes, sir.
4      Q      And was the proffer document, or the proffer
5  letter explained to the defendant?
6      A      Yes, sir, it was.
7      Q      Was it explained to the defendant that if he was
8  going to participate in the proffer, he had to be 100 percent
9  truthful?
10     A      Yes, sir.
11     Q      And if he was 100 percent truthful, anything he
12  said could not be used against him?
13     A      That's correct, sir.
14     Q      And if he was not, then it could?
15     A      That's correct.
16     Q      Okay.  And based on your interview was the
17  defendant truthful?
18     A      No, sir, he was not.
19            MR. GONZALEZ:  And may I approach the witness,
20     Your Honor?
21            THE COURT:  Yes.
22     Q      (By Mr. Gonzalez)  I've handed you what's been
23  previously marked for identification purposes as Government's
24  Exhibit 9.  Do you recognize Government's Exhibit 9?
25     A      Yes, sir.

1    Q    And does it truthfully and accurately purport what
2  it purports to depict?

3    A    Yes, sir.

4    Q    Has it been changed or altered in any way?

5    A    No, sir.

6    Q    And is that the same document that was reviewed
7  with the defendant at the proffer session?

8    A    That is correct.  It is signed by AUSA Ernest
9  Gonzalez, Mr. Jenkins, counsel for Daniel Mendoza, and Daniel
10 Mendoza himself.

11          MR. GONZALEZ:  Your Honor, at this time we would
12      offer Government's Exhibit 9 into evidence.

13          MR. JENKINS:  No objection, Your Honor.

14          THE COURT:  It's admitted.

15   Q    (By Mr. Gonzalez)  And you indicated that he
16 provided a statement that wasn't 100 percent truthful,
17 correct?

18   A    That is correct.

19   Q    Was it made clear to the defendant by myself, as
20 well as his attorney, and the document, that he needed to be
21 100 percent honest?

22   A    Yes, sir.

23   Q    And what did he tell you in his interview?

24   A    He admitted to purchasing marijuana from Big C.
25 He indicated he was also involved in kilogram and other --

heroin distribution, as well. He further stated that he did
not distribute methamphetamine. And then he indicated that a
stash house along with -- a stash house, apartment 281,
belonged to Big C as well. Christian Sorto-Villatoro.

Q    So you knew that was not 100 percent truthful,
correct?

A    That's correct.

Q    And based on your investigation, he was
distributing methamphetamine, correct?

A    Yes, sir, that's correct.

Q    And in fact, we was distributing methamphetamine?

A    Yes, sir, he did.

Q    And he also told you that Big C was the one
running the stash house.

A    That is correct, sir.

Q    And you knew that Big C was a worker, correct, for
himself and his brother?

A    Yes, sir.

Q    So that wasn't truthful on his part?

A    That's correct as demonstrated by the calls that
day, clearly outlined the structure.

Q    And the structure is one where he's partners with
his brother, correct?

A    Yes, sir.

Q    And they had the workers at the stash house

1    distributing the drugs for them.

2       A       That is correct, sir.

3       Q       And in regards to the interview, did you ask him

4    any questions about Cristian Mendoza?

5       A       Yes, sir, we attempted to.

6       Q       And did he answer any questions?

7       A       No, he became very upset, almost irate, and

8    refused to speak with us further and wanted to go back to his

9    cell.

10      Q       Now in regards to Cristian Mendoza, has he been

11   charged with any other offenses pending this sentence that

12   you're aware of?

13      A       I would have to look at his criminal history.  I

14   don't remember off the top of my head.

15      Q       Let me be more specific.  Was Cristian Mendoza

16   caught with a cell phone at the Bowie County jail?

17      A       I apologize.  Yes, sir.

18      Q       And was he charged by a grand jury for that

19   offense for possessing that cell phone within the Bowie County

20   jail?

21      A       Yes, sir.  He was indicted on November 11th for

22   that offense.

23      Q       And are you familiar with the facts that led to

24   that Indictment's?

25      A       Yes, sir, I am.

1      Q      What do you know about that particular incident?

2      A      The warden of Fannin County contacted the warden

3  of Bowie County indicating there was an inmate there at Bowie

4  County who was posting pictures on Facebook while

5  incarcerated.

6             The jailers there at Bowie County immediately did

7  a search of the pod that that inmate was in, and recovered

8  several cell phones, one of which was under the mattress of

9  Cristian Mendoza where he was lying in bed sleeping that day.

10     Q      And that's the particular cell phone that he was

11 charged with possessing at the Bowie County jail, correct?

12     A      Correct.  It was underneath his mattress.  In

13 between the sheets and the mattress -- sheets and mattress

14 there.

15     Q      And he was in fact lying on top of the phone,

16 correct?

17     A      That is correct, sir.

18             MR. GONZALEZ:  I believe that's all I have, Your

19     Honor, for now.  I'll pass the witness.

20             MR. MULDER:  May I proceed?

21             THE COURT:  Yes.

22                        CROSS-EXAMINATION

23 BY MR. MULDER:

24     Q      You told us that -- well, first of all, my name is

25 --

```
1              THE CLERK:  Can you stand, please?
2              MR. MULDER:  Yes, I can.
3      Q      (By Mr. Mulder)  I've got just a few questions for
4  you.  About that last part, you indicated that Cristian
5  Mendoza had been indicted by a grand jury.  When was that?
6      A      On November -- I'm sorry, September 11.
7      Q      Oh, September.  I thought you said November.
8              THE COURT:  Of what year?
9              THE WITNESS:  September 11, 2019.
10     Q      (By Mr. Mulder) Of this year?
11     A      Yes, sir.
12     Q      Just a week ago, or 10 days ago or so?
13     A      Give or take.
14     Q      Now you didn't participate in the search of that
15  cell.
16     A      No, sir, I was not there.
17     Q      You weren't there and you didn't see any of this.
18     A      No, sir.  I was provided a report of the detailed
19  information.
20     Q      So basically everything you told us was hearsay
21  you got from a report?
22     A      Correct.
23     Q      Is anybody here that actually participated in the
24  search of the cell?
25     A      Yes, sir.
```

```
1        Q       Who was that?
2        A       The correction officer seated behind you, the
3   lieutenant from Bowie County.
4        Q       So he would know firsthand about this search,
5   wouldn't he?
6        A       Yes, sir.
7        Q       That would be better evidence from him, I suppose,
8   as to the search of that cell?
9        A       He would have evidence, yes, sir.
10       Q       Very good.  As to the gun that was found in --
11  behind the headboard in Cristian Mendoza's room in the box, do
12  you remember that?
13       A       Yes, sir.
14       Q       Had that gun been fired before?
15       A       I was not involved in the seizure or the testing
16  of that firearm to tell such.  I do not know.
17       Q       But it was in the box unloaded in parts, correct?
18       A       It was unloaded, yes, sir.
19       Q       And it was -- I guess what I'm driving at, is that
20  that gun wasn't readily accessible, was it?
21       A       It was in a box behind his bed, so I would say it
22  is readily accessible.  It wasn't sitting open in the
23  nightstand but it was in a box behind his bed.  All he had to
24  do was reach back there and open it.
25       Q       And it was unloaded?
```

1      A      If someone points a gun at you, Mr. Mulder, you're

2  not going to figure out whether it's loaded or not.  So to

3  answer your question, the gun, yes, was unloaded.

4      Q      Well then if he were to use the gun to defend the

5  drugs, it should be loaded shouldn't it?

6      A      Not necessarily.

7      Q      Okay.  But anyway, he wasn't charged -- or his

8  sentence wasn't enhanced with that particular weapon, was it?

9      A      I do not know which weapon was utilized for his

10  charge or for his sentencing or in his PSR.

11      Q      To whom did the gun that was found in apartment

12  281, belong?

13      A      It was my representation that that gun was there

14  from Cristian and Daniel Mendoza to protect the drug proceeds

15  and the drugs that were being sold and collected at that

16  location.

17      Q      And is that just your opinion, or do you have some

18  evidence?

19      A      That's my opinion.

20      Q      Who bought the gun?

21      A      Do not know.

22      Q      Was it stolen?

23      A      Do not know.  No, sir, it was not stolen.

24      Q      Where was it purchased?

25      A      I do not know.

1    Q    Did you ever find out?

2    A    No, sir, I did not.

3    Q    Why not?

4    A    Because the gun was seized by another entity and

5    given to them.

6    Q    Well, I mean that would be pretty good evidence as

7    to who purchased the gun.  If Cristian bought it, I would have

8    very little to say about ownership of the gun.

9    A    Okay.

10    Q    But no one ever looked into that?

11    A    I'm not going to say no one ever looked into it.

12    I'm telling you I do not know.

13    Q    Okay.  And it's your testimony today that Jeovany

14    Aguilar was a worker for Cristian and Daniel Mendoza?

15    A    Yes, sir.  He assisted them in the sale of the

16    drugs to the customers, and the collection of the drug

17    proceeds.

18    Q    He wasn't involved in that recorded deal though

19    for the five grams of heroin though, right?

20    A    No, sir, he was not.

21    Q    Was he present there?

22    A    To my knowledge, no, sir, he was not.

23    Q    What house did he help manage?  Or what was his

24    specific function as a worker?

25    A    It's been alleged that he was involved in the

1  house on Wood Valley, the previous location before the

2  apartment on Cockerill Hill.

3      Q      Okay.  So his involvement was earlier before the

4  Cockerill Hill apartment was rented?

5      A      That is correct, sir.

6      Q      Was he still a part of the enterprise back in

7  October of 2018?

8      A      I don't have that specific information at this

9  time.

10     Q      How much was he paid by either Daniel or Cristian

11  Mendoza?

12     A      I do not have that information.

13     Q      Did he get a percentage, or did he get a set

14  salary?

15     A      I do not have that information.

16     Q      Did you talk to Jeovany Aguilar?

17     A      No, sir, I have not.  As of this date, I have not.

18     Q      Has he been arrested?

19     A      No, sir, he has not.

20     Q      Who told you that Jeovany Aguilar worked for the

21  Mendozas?

22     A      There were multiple cooperating defendants that

23  identified Mr. Aguilar.

24     Q      Okay.  Who?  What are their names?

25     A      There were multiple cooperating defendants

1    identified Mr. Aguilar.

2         Q    So you don't want to tell me who they are?

3         A    That's correct, sir.

4         Q    What about Elias Mendoza and Christian

5    Sorto-Villatoro?  Those are the guys that were actually there

6    when it was raided.

7         A    That is correct, sir.

8         Q    Okay.

9         A    Well they were there the night of the purchase.

10   They were not there when the search warrant was served.

11        Q    Oh, that's right.  It was --

12        A    Alejandro Flores.

13        Q    Right.  Flores was there when the search warrant

14   was conducted?

15        A    Correct.

16        Q    I'll call him Elias to avoid confusion.  Elias and

17   Sorto-Villatoro, did they get a percentage, or did they get a

18   salary from these drug proceeds?

19        A    I do not have that information.

20        Q    Did you talk to Elias and Sorto-Villatoro?

21        A    No, sir, I have not, as of this date.

22        Q    Have they been arrested?

23        A    No, sir, they are not, as of this date.

24        Q    So how -- what direct information tells you that

25   they worked for, or directly under Cristian and Daniel

1    Mendoza?

2        A        They were identified by multiple cooperating

3    defendants.  In addition to that, during the call Cristian

4    tells them to go to the spot.  The spot is where Elias and

5    Sorto-Villatoro were at serving up user quantities of heroin

6    which we purchased that night.  Indicating --

7        Q        I'm sorry, go ahead.

8        A        Go ahead.

9        Q        So -- and that was the call from Mr. Astran that

10   we heard?

11       A        Yes, sir.

12       Q        And how much heroin did you find in Cristian

13   Mendoza's house?

14       A        The heroin in the bedroom, it was -- I don't have

15   the total right off the top of my head.  I would have to look

16   at the report to see what the total was.

17       Q        Can you just give me an estimate?  Was it a couple

18   of grams, or was it a couple of pounds?

19       A        It wasn't a pound.  It might have been a couple of

20   ounces at the most.

21       Q        And what about the methamphetamine?  Just a ball

22   park is fine.

23       A        At the residence we didn't find methamphetamine.

24   At the apartment there were maybe an ounce of methamphetamine

25   there.

1      Q    Okay.  So it didn't seem to be a great deal of

2  controlled substance at the Wyoming address was there?

3      A    No, sir.

4      Q    Would that indicate that the Mendozas were getting

5  it from another source?

6      A    That would -- yes, sir.

7      MR. MULDER:  I believe that's all, Judge.

8                CROSS-EXAMINATION

9  BY MR. JENKINS:

10     Q    Good morning.

11     A    Good morning.

12     Q    Robert Jenkins.  We know each other?

13     A    Yes, sir.

14     Q    I just have a very few questions, I think

15  Mr. Mulder covered most of it.  But we did see in Daniel's

16  bedroom the ammunition, but we -- so we never found that

17  gun -- the gun that went with those bullets?

18     A    No, sir, we did not.

19     Q    And still that's the case now.  There is no -- and

20  that's not the gun that -- we don't believe he owned the gun

21  at the apartment.  That was your opinion?

22     A    I believe that gun was at the apartment for the

23  protection of the drug proceeds and the drugs that were being

24  sold from the apartment that was ran by Cristian and Daniel

25  Mendoza.

1      Q      But we don't have any receipts to that gun.  We
2   don't have any ownership to Daniel.

3      A      No, sir.

4      Q      And the gun that was found in the home was behind
5   Cristian's bed?

6      A      Correct, sir.

7      Q      And on those phone calls and the video I didn't
8   hear a reference to Daniel.

9      A      No, sir.

10      Q      So we heard that Cristian was Trigger, and we
11   heard the other -- I mean he was not in the stash house,
12   correct?

13      A      Who?

14      Q      Daniel.

15      A      No, sir.

16      Q      And he wasn't on those phone calls?

17      A      No, sir.

18      Q      Do we have any indication of -- of Daniel getting
19   paid, or being on the salary, or any of that?

20      A      There was money in his drawer there in his
21   bedroom, indicating that he was receiving payment, yes, sir.

22      Q      Well, there was money in his bedroom, but we don't
23   know where that came from.  There wasn't a ledger associated
24   with that?

25      A      There was a ledger that was recovered in

1    Cristian's room, but it didn't have Daniel's name on it.

2        Q      Right.  That was not in Daniel's room.

3        A      Correct.  That was in Cristian's room.

4        Q      There wasn't a ledger in Daniel's room, we don't

5    have a direct tie to the currency that was in his room.

6        A      Just they were in close proximity to the heroin.

7    And to be honest --

8        Q      I'm not saying it wasn't in close proximity.  I'm

9    saying we don't have a ledger and we don't have a gun.

10       A      Correct.

11              MR. JENKINS:  I don't have anything further.

12       Thank you.

13              MR. GONZALEZ:  Nothing further of this witness,

14       Your Honor.

15              THE COURT:  All right.  I'm trying to understand.

16       Now Mr. Daniel Mendoza pled guilty to possession of a

17       firearm in furtherance of a drug trafficking crime.

18              MR. JENKINS:  He did.

19              THE COURT:  All right.  And you're not contesting

20       that?

21              MR. JENKINS:  No.

22              THE COURT:  All right.  Thank you.

23              But then he wasn't enhanced otherwise because he

24       had -- he pled guilty to that independent offense.

25              MR. JENKINS:  Yes, sir.

```
1              THE COURT:  Okay.
2              MR. GONZALEZ:  The government calls Roel Astran.
3              THE COURT:  You may step down.
4         I have a question for the probation officer.
5         Did you get that information on the online
6    material?
7              PROBATION OFFICER:  Yes, Your Honor.
8              THE COURT:  Okay.  Then we can show that to the
9    defense attorney who had a question about that earlier.
10             THE CLERK:  Raise your right hand for the oath,
11   please.
12             You do solemnly swear that the testimony you shall
13   give in the case now on hearing shall be the truth, the
14   whole truth, and nothing but the truth so help you God.
15             THE WITNESS:  Yes.
16             MR. GONZALEZ:  May I proceed, Your Honor?
17             THE COURT:  Yes.
18                       ROEL ASTRAN,
19   after having been sworn, testified as follows:
20                     DIRECT EXAMINATION
21   BY MR. GONZALEZ:
22        Q    Sir, would you please state your full name for the
23   Court and the record.
24        A    Roel Astran.
25        Q    And spell your first name.
```

|     |   |                                                        |
| --- | - | ------------------------------------------------------ |
| 1   | A | R-O-E-L.                                                |
| 2   | Q | And your last name.                                    |
| 3   | A | A-S-T-R-A-N.                                            |
| 4   | Q | How old are you, sir?                                   |
| 5   | A | 50.                                                     |
| 6   | Q | Where were you born?                                    |
| 7   | A | Dallas, Texas.                                          |
| 8   | Q | And what's the highest level of education that you     |
| 9   |   | obtained?                                              |
| 10  | A | Ninth grade.                                            |
| 11  | Q | And presently you're serving time for conspiracy       |
| 12  |   | to possess with the intent to distribute heroin; is that |
| 13  |   | correct?                                               |
| 14  | A | Yes, sir.                                               |
| 15  | Q | And you were sentenced in this courtroom, correct?     |
| 16  | A | Yes, sir.                                               |
| 17  | Q | How much time did you receive?                          |
| 18  | A | 236 months.                                             |
| 19  | Q | When did you first start distributing drugs?            |
| 20  | A | Probably about a year ago.                              |
| 21  | Q | And who was supplying -- or what type of drugs did     |
| 22  |   | you distribute?                                        |
| 23  | A | Meth.                                                   |
| 24  | Q | And what quantities of meth?                            |
| 25  | A | Ounces.                                                 |

1        Q        And were you also distributing heroin?

2        A        Yes, sir.

3        Q        Okay.  And what quantities of heroin did you

4   distribute?

5        A        Ounces.

6        Q        And who was supplying you the meth and the heroin?

7        A        You talking about my brother?  Who I hear from?

8        Q        Yes.

9        A        You want me to say his name?

10       Q        Yes, sir.

11       A        Cristian Mendoza.

12       Q        And do you see Cristian Mendoza in the courtroom

13   today?

14       A        Yes, sir.

15       Q        And would you point to where he's seated and

16   indicate an article of clothing that he's wearing.

17       A        He's wearing the same kind of clothing I am, right

18   across the hall from me.

19       Q        Okay.  Let me do it this way.  Person number one,

20   person number two, person number three, person number four.

21       A        Two, sitting next to the man with the glasses.

22       Q        Person number one, person number two, person

23   number three --

24       A        Person number two.

25       Q        Person number two?

1    A    Yes, sir.

2         MR. GONZALEZ:  Your Honor, may the record reflect

3    that this witness has identified Cristian Mendoza?

4         THE COURT:  Yes.

5    Q    (By Mr. Gonzalez)  So he was supplying you the

6    heroin and the methamphetamine?

7    A    Yes, sir.

8    Q    In ounce quantities?

9    A    Yeah.  I was buying from him and selling to

10   somebody else.

11   Q    And who were you selling it to?

12   A    To a guy named Tyton Hester.

13   Q    And where was Tyton Hester from?

14   A    Sherman.

15   Q    And would Tyton Hester come to you, and you act as

16   a middle man for the drugs?

17   A    Yes, sir.  Yes, sir.

18   Q    For both methamphetamine and the heroin?

19   A    Yes, sir.

20   Q    Okay.  Well let's walk through a transaction.

21   Tyton Hester comes from Sherman.

22   A    He calls me.

23   Q    He calls you?

24   A    He calls me first.

25   Q    And then what happens?

1      A      And then I call Cristian and set it up.  And Tyton

2  comes picks me up and takes me to go get it.

3      Q      Both the heroin and the methamphetamine?

4      A      Yeah, whatever he calls for, we go get it.

5      Q      Okay.  So then you call Cristian Mendoza.

6      A      After I get off the phone with Tyton, yeah.

7      Q      And then he tells you whether he has it or not?

8      A      Yeah.  If he had it, he'll get it.

9      Q      Does he tell you where to go to pick it up?

10     A      Yes, sir.

11     Q      And where would you go to go pick up the drugs?

12     A      I would meet him at the spot.  At his apartment or

13  the house they had before.  He had -- he had two apartments.

14  He had an apartment first, and then he moved to a house and

15  back to the apartment.

16     Q      So he had several locations?

17     A      Yeah, but I didn't know -- I mean the first one I

18  went to, I guess he probably moved from there to the house.

19  And then I started meeting him at the house.  And then from

20  there we started meeting in another apartment.

21     Q      Okay.  And did the quantities start small?

22     A      Started small and started getting progressively

23  more -- to larger amounts.

24     Q      Okay.  So when you say they started small, what

25  was the quantity?

1      A      Probably about 16 ounces.

2      Q      And then what did they grow to?

3      A      To 32.

4      Q      And is that for the heroin?

5      A      The meth.

6      Q      The meth.  What about the heroin?

7      A      Heroin, probably like one or two ounces at a time.

8      Q      And did it grow?

9      A      No, it stayed like that.

10     Q      And when you were directed to go to the spot, were
11  there individuals there that were working for Cristian
12  Mendoza?

13     A      Yes, sir.

14     Q      And who were they?

15     A      A guy -- I only know them by C and E.

16            MR. GONZALEZ:  Can I have Government's Exhibit 7,
17     please.

18     Q      (By Mr. Gonzalez)  Do you recognize that
19  individual?

20     A      That's E.

21     Q      Was that one of the workers?

22     A      Yes, sir.

23     Q      Was he working for Cristian Mendoza to deliver the
24  drugs?

25     A      Yes, sir.

1      Q      And I have Government's Exhibit 8.  And do you

2  recognize that individual?

3      A      That is Big C.

4      Q      Was he also working at the spot?

5      A      Yes, sir.  Yes, sir.

6      Q      So he would deliver the meth or the heroin to you

7  that you needed?

8      A      I was -- I was going to meet Cristian Mendoza or

9  his little brother Daniel there, or I would get it from him,

10  from his workers.

11      Q      Okay.  So -- once again, so you needed the drugs

12  for Hester.  You made the call to Cristian Mendoza, and then

13  you would meet either Cristian Mendoza, Daniel Mendoza, or C

14  or E at that location to get the drugs?

15      A      Yes, sir.  Yes, sir.

16      Q      In the same quantities that you just mentioned

17  earlier?

18      A      Yes, sir.

19      Q      And you indicated that there were two different

20  locations, or three different locations that they used --

21  three different locations that you would go, and that same

22  process would happen?

23      A      Yes, sir.

24      Q      How often were you doing that?

25      A      About a year.  Oh, are you talking about --

1  probably like once or twice a week.

2      Q      In the quantities that you mentioned that started

3  off small and grew to those larger quantities?

4      A      Yes, sir.

5      Q      And when you went to those particular locations,

6  were there firearms there?

7      A      That I seen, yes.

8      Q      Okay.  At the stash locations that you indicated

9  that they would meet you at, as well as where E and C worked

10 at?

11     A      Yes, sir.

12     Q      Now I'll show you another photograph.  Let's look

13 at Government's Exhibit 9, please.  I'm sorry, Government's

14 Exhibit 6.

15         Do you recognize that individual?

16     A      He's been here.  I mean I've seen him there

17 before.

18     Q      At the spot?

19     A      Yes, sir.

20     Q      Okay.  Was he another worker for the Mendozas?

21     A      I don't think he was -- he -- he just hung out

22 there.

23     Q      Okay.  So as far as you know, he wasn't.  But if

24 somebody else identified him as a worker, you wouldn't know

25 that?

1    A    Yeah.

2    Q    Okay.  Now when you talked about Cristian Mendoza

3  and Daniel Mendoza distributing drugs to you, were they

4  working as partners in doing this?

5    A    I mean I couldn't really tell you, but I know

6  that -- I mean Daniel Mendoza, I would call him when I needed

7  something for my personal use and he would bring it to me.

8  But Cristian Mendoza would be the one to give the bigger

9  quantities for me.

10    Q    All right.  But on occasion when you needed those

11  bigger quantities, Daniel Mendoza would show up to make the

12  delivery, too?

13    A    Well, no, he wasn't there.  I would have to come

14  pick it up.  But if Cristian Mendoza wasn't available, then he

15  would tell me just meet his brother.

16    Q    Okay.  And then you would get that quantity that

17  you were looking for?

18    A    Yeah.  Yes, sir.

19    Q    The larger quantity?

20    A    Yes, sir.

21    Q    And was that the only two types of drugs that you

22  received from him?  Methamphetamine and heroin?

23    A    No, sir.

24    Q    What else would you receive?

25    A    There was a couple occasions that we -- that I

bought cocaine from them, and also Xanax pills.

Q    Okay.  And do you know where the man that you were selling to, Hester, was taking it to for distribution?

A    As far as I know, I was told -- I mean he was taking it to Sherman.  But what he was doing with it there, I don't know.  He was taking it back to Sherman.

Q    Okay.  And were you paying Cristian and Daniel Mendoza for the drugs that you were buying?

A    For myself, or for Hester?

Q    For Hester.

A    With Hester's money, yes.

Q    So Hester would give you the money?

A    Yes, sir.

Q    And depending on who you met, that's who you would pay the money to?

A    Yes, sir.

Q    And it was either Cristian or Daniel Mendoza?

A    Yes, sir.  Or his workers.

Q    Or his workers.  Now you also cooperated with law enforcement at the time of your arrest, correct?

A    Yes, sir.

Q    And you went to an apartment and purchased drugs on behalf of law enforcement, correct?

A    Yes, sir.

Q    And on that particular occasion you called who, to

1    set up that deal?

2        A      Cristian.

3        Q      And is that typically the way you would do it?

4    You would call him and he would direct you as to what to do

5    next?

6        A      Yes, sir.

7        Q      And you had other sources of supply, correct?

8        A      As far as what?

9        Q      Did you have any other sources of supply?

10       A      No.

11       Q      They were the only sources of supply?

12       A      Yes, sir.

13       Q      And when you talked about Daniel -- Daniel

14   Mendoza, do you see him in the courtroom here today?

15       A      Yes, sir.

16       Q      Would you point to where he's seated and then an

17   article of clothing he's wearing.

18       A      Yeah.  He's sitting right there, fourth person in

19   the seat.

20              MR. GONZALEZ:  Your Honor, may the record reflect

21        this witness has identified Daniel Mendoza.

22              THE COURT:  Yes.

23              MR. GONZALEZ:  That's all I have of this witness.

24                      CROSS-EXAMINATION

25   BY MR. MULDER:

1    Q    Mr. Astran, I've just got a few questions for you.
2  My name is Chris Mulder.  If I ask you a question you don't
3  understand, just let me know and I'll try and rephrase it a
4  different way.  Okay?
5    A    All right.
6    Q    So your testimony today is that you were not -- is
7  that Cristian Mendoza and I guess his brother --
8    A    I can barely hear you.
9    Q    Okay.  Is that better?
10   A    Yes, sir.
11   Q    All right.  Your testimony today is that Cristian
12  Mendoza and Daniel Mendoza were your only sources?
13   A    Yes, sir.
14   Q    So you did not receive drugs from Jesus Ordaz?  Do
15  you know who Jesus Ordaz is?
16   A    Yes, sir.  He's back there in the back room.
17   Q    Okay.  You didn't buy any dope from him ever?
18   A    For my personal use.
19   Q    For your personal use?
20   A    Yeah.
21   Q    But never quantities to resell, or on behalf of
22  anyone else?
23   A    I may have once or twice.  No, maybe one time.
24  One time when I couldn't get ahold of Cristian, I called him
25  once.

1      Q      Okay.  So he was like your back-up supply?

2      A      Yeah.  But I mainly called him for my personal

3  use.

4      Q      Okay.  You were able to identify for the judge

5  that this Jeovany -- he's the third picture you saw.  You said

6  he was not a worker for Cristian and Daniel, that he just hung

7  out there at the house?

8      A      Yes, sir.

9      Q      But yet you told us that -- and we know that Elias

10  and Christian probably were.  They were at the house when you

11  bought?

12      A      Excuse me?

13      Q      E and Big C, they were there when you bought the

14  heroin?

15      A      I bought it from them, as well.

16      Q      Okay.  Did you ever call the house direct, or did

17  you always go through Cristian?

18      A      I go through Cristian.  If he weren't around, I

19  called his workers.

20      Q      Because there was a cell number that was assigned

21  to the house; is that right?

22      A      To the workers, yeah.

23      Q      Okay.  So sometimes you would be able to do a deal

24  and not even involve Cristian?

25      A      If it was a large amount, I called Cristian.

```
 1      Q      That's not what I asked.  I said sometimes you
 2  were able to do a deal and not involve Cristian.
 3      A      For my personal use, yes.
 4      Q      Okay.  So those were just small quantities?
 5      A      Yeah, just my personal use.
 6      Q      Okay.  How often did you do that?
 7      A      Every other day.
 8      Q      Did you drive yourself, or did somebody drive you?
 9      A      I drove myself.
10      Q      Okay.  So about every other day you would go to
11  the house, deal directly with the guys that were there?
12      A      Yeah, for my personal use.
13      Q      For personal use.
14      A      Yes, sir.
15      Q      What was your drug of choice?  Heroin?
16      A      Heroin.
17      Q      What was your sentence?  You got 236?
18      A      Yes, sir.
19      Q      And you understand you hope that they are going to
20  cut that in half, I guess, after today?
21      A      I wasn't promised anything or guaranteed anything.
22      Q      That's your hope, is that they will cut that
23  sentence; isn't that true?
24      A      I guess if you say that, yes.
25      Q      Well it's not me.  I mean everybody wants their
```

1  sentence --

2      A      They didn't guarantee me nothing.  They didn't

3  promise me nothing.  I'm just doing what I feel is right.

4      Q      And you hope to get a benefit though, of course?

5      A      It would be nice.

6      Q      Right.  Okay.  I couldn't quite understand your

7  answer to the question about the firearm.  Did you see it

8  there?

9      A      Yes, sir.

10     Q      Was it the same gun all the time?

11     A      Different ones.

12     Q      Different ones.  So it was like -- did Big C have

13  his own pistol?

14     A      It was laying on the counter.

15     Q      What did it look like?

16     A      Excuse me?

17     Q      What did it look like?

18     A      Black.  A hand pistol.

19     Q      Was it semi-automatic or a -- was it

20  semi-automatic?

21     A      Yes, sir.

22     Q      Okay.  What were the other ones you saw there?

23     A      I saw -- I think one of them was like a AK47.  I'm

24  not really too familiar with guns.

25     Q      Okay.  And this 281, I guess the final apartment,

1    you say that was the third spot --

2        A    Yes, sir.

3        Q    -- where they sold out of?

4        A    Yes, sir.

5        Q    Have you been to all of them?

6        A    Yes, sir.

7             MR. MULDER:  That's all.

8                     CROSS-EXAMINATION

9    BY MR. JENKINS:

10       Q    Mr. Astran, my name is Robert Jenkins.  Same

11   thing.  If you don't understand a question, I'll repeat it.  I

12   don't have much.

13            You said that whenever you wanted to set up a

14   purchase you would call Cristian; is that correct?

15       A    Yes, sir.  For big quantities, yes.

16       Q    But you would always start with Cristian?

17       A    Yes, sir.

18       Q    And sometimes he would say -- like he wasn't

19   around, call his little brother; is that correct?

20       A    Yes, sir.  Yes, sir.

21       Q    But you always started calling Cristian first.

22       A    Yes, sir.

23       Q    And did you ever have occasion that when you went

24   to the -- one of these houses to pick up, that Daniel was

25   there before you got there?  I mean if you hadn't called him

1  was he around?

2      A      If I called Cristian and Cristian wasn't around,

3  he would tell me to call his brother or meet his brother.

4      Q      Right.  But when you went there -- you said you

5  went there occasionally sometimes without Cristian.

6      A      To meet his brother.  To meet his brother or his

7  workers.

8      Q      Sometimes the workers were there -- like I believe

9  you said, you were getting personal amounts?

10      A      Yes.  For personal stuff I was calling --

11      Q      And when you did something like that, if you

12  hadn't called Cristian or Daniel to help you with somebody

13  picking it up, they weren't there, were they?

14      A      When I picked up my personal, no.

15      Q      Okay.  So they weren't hanging out there.

16      A      No.

17      Q      And you would have to call Cristian, and then be

18  told maybe to call Daniel.  If he couldn't do it, correct?

19      A      For the big quantities, yeah.

20      Q      And did you -- you said everyone.  Whoever you

21  picked up from he would pay them directly?

22      A      Excuse me?

23      Q      If you went and you met with Cristian you would

24  pay him, or if you went and met with Big C or E, you would pay

25  them.  Just whoever -- whoever you got.

1    A     If I was buying the big quantities, I would meet

2    Cristian or his brother and pay them.  If it was personal use,

3    it would be mine from E and C.

4    Q     Okay.  About how often do you think you --

5    A     For -- for the big quantities.

6    Q     Let me -- about how often do you think you

7    interacted with Daniel and not Cristian?

8    A     Probably about -- out of the twice a week I was

9    going for Tyton, probably like maybe twice a month, or three

10    times a month.  I dealt more with Cristian.

11    Q     Thank you.

12    MR. JENKINS:  That's it.  Thank you.

13                REDIRECT EXAMINATION

14    BY MR. GONZALEZ:

15    Q     One quick follow-up question, sir.  You -- you did

16    an interview on October 30, 2018.  And on there you indicated

17    that -- you identified Cristian Mendoza, and you indicated you

18    had been dealing with him probably two years.

19    A     Yes, sir.

20    Q     So two years?

21    A     Yes, sir.

22    Q     Prior to your arrest?

23    A     Excuse me?

24    Q     Prior to your arrest.  Two years prior to arrest?

25    A     Yes, sir.

```
1      Q      When were you arrested?
2      A      October 2nd, last year.
3      Q      October of 2018?
4      A      Yes, sir.
5      Q      All right.  Thank you.
6             MR. GONZALEZ:  That's all I have of this witness.
7             THE COURT:  All right.  You may step down.
8             I take it you had no more questions of this
9      witness?
10            MR. MULDER:  No more questions.
11            THE COURT:  All right.
12            MR. JENKINS:  No more questions.
13            THE COURT:  The government calls Jesus Ordaz.
14            THE CLERK:  Can you raise your right hand for the
15     oath, please.
16            You do solemnly swear that the testimony you shall
17     give in the case now on hearing shall be the truth, the
18     whole truth, and nothing but the truth, so help you God.
19            THE WITNESS:  Yes, ma'am.
20            MR. GONZALEZ:  May I proceed, Your Honor?
21            THE COURT:  Yes.
22                           JESUS ORDAZ,
23     after having been sworn, testified as follows:
24                        DIRECT EXAMINATION
25     BY MR. GONZALEZ:
```

 1     Q     Sir, would you please state your full name for the
 2  Court and the record.
 3     A     Jesus Ramos Ordaz.
 4           THE COURT:  This is very hard to understand.  You
 5     need to pronounce it again.
 6           THE WITNESS:  Jesus Ramos Ordaz.
 7     Q     (By Mr. Gonzalez)  Spell your last name for us.
 8     A     Huh?
 9     Q     Spell your last name for us.
10     A     O-R-D-A-Z.
11     Q     How old are you, sir?
12     A     Twenty-one.
13     Q     Where were you born?
14     A     Dallas.
15     Q     And what's the highest level of education that you
16  attained?
17     A     I got a GED.
18     Q     And you're presently serving time for conspiracy
19  to possess with the intent to distribute methamphetamine; is
20  that correct?
21     A     Yes, sir.
22     Q     How much time did you receive for that offense?
23     A     Twenty years.
24     Q     And is that an offense out of this court?
25     A     Yes, sir.

1      Q      Okay.  When did you start your involvement in
2 distributing illegal drugs?
3      A      Like 2016/2015.
4      Q      All right.  In 2015/2016 when you started, what
5 type of drug did you start with?
6      A      Heroin.
7      Q      And did it start in small quantities and increase
8 to larger quantities?
9      A      Yes, sir.
10      Q      And what quantity did you start off selling or
11 distributing?
12      A      Half ounce, ounce.
13      Q      And it grew to what quantity after that?
14      A      Half a kilo, kilo.
15      Q      So right prior to your arrest, right before you
16 were arrested you were up to a kilo of heroin?
17      A      Maybe a half or a whole, yeah.
18      Q      And did you also distribute methamphetamine?
19      A      Yes, sir.
20      Q      And did it start the same way, where you started
21 off with small quantities and then build up to larger
22 quantities?
23      A      Yes, sir.
24      Q      Okay.  Who were you receiving your heroin and your
25 methamphetamine from?

1    A    From Cristian Mendoza.

2    Q    Okay.  And do you see Cristian Mendoza in the

3  courtroom today?

4    A    Yeah, I see him.

5    Q    Would you point to where he's seated and indicate

6  an article of clothing -- let me do it this way.  This is

7  person number one at the end of the table, person number two,

8  person number three, person number four at this particular

9  table.  What person would Cristian Mendoza be?

10   A    Number two.

11        MR. GONZALEZ:  Your Honor, may the record reflect

12     that this witness has identified Cristian Mendoza?

13        THE COURT:  Yes.

14   Q    (By Mr. Gonzalez)  So you started purchasing what

15  with Cristian Mendoza?  Heroin or methamphetamine?

16   A    Heroin.

17   Q    And in the small quantities that you indicated,

18  and then it grew to larger quantities?

19   A    Yes, sir.

20   Q    All right.  Now when --

21        THE COURT:  And when was that?

22   Q    (By Mr. Gonzalez)  You indicated 2015/2016 is when

23  this started?

24   A    Yes, sir.

25   Q    And when you needed the drugs, would you call him

1  directly?

2       A    Yes, sir.

3       Q    And what would he tell you to do?  Would he

4  deliver the drugs to you, or would he send you to someone

5  else?

6       A    Both.

7       Q    Okay.  Explain that to us.  You called and what

8  would he tell you?

9       A    I pull up on him, or I would meet with his

10 brother.

11      Q    So his brother would also service you, or provide

12 you the drugs?

13      A    Yes, sir.

14      Q    And who is his brother?

15      A    Daniel Mendoza.

16      Q    What number would he be if he's in the courtroom?

17      A    Number four.

18           THE COURT:  Your Honor, may the record reflect

19      that this witness has identified Daniel Mendoza?

20           THE COURT:  Yes.

21      Q    (By Mr. Gonzalez) So either Cristian Mendoza or

22 Daniel Mendoza would provide you the heroin or the

23 methamphetamine that you called for?

24      A    Yes, sir.

25      Q    Did they also have workers?

1      A      Yes, sir.

2      Q      And do you know the names of the workers that they

3   have for them?

4      A      Big C, Bullet, E.

5      Q      Okay.  And let's go to Government's Exhibit 6.

6             Do you recognize that person?

7      A      Yes, sir.

8      Q      Who is that person?

9      A      Bullet.

10     Q      And you know him as Bullet.  Was he a worker for

11  Cristian and Daniel Mendoza?

12     A      Yes, sir.

13     Q      Would he make deliveries for them?

14     A      Yes, sir.

15     Q      Let's go to Government's Exhibit 7, please.

16            Do you recognize that individual?

17     A      Yes, sir.

18     Q      And who is that?

19     A      E.

20     Q      Was E also a worker?

21     A      Yes, sir.

22     Q      Would he deliver or run the stash house for them?

23     A      Yes, sir.

24     Q      And Government's Exhibit 8.

25            And do you recognize that person?

1      A      Yes, sir.

2      Q      Who is that person?

3      A      Big C.

4      Q      Would he also deliver or run a stash house for

5  them?

6      A      Yes, sir.

7      Q      Did either of these individuals -- when you

8  weren't meeting with Daniel Mendoza and Cristian Mendoza, you

9  would meet these other individuals to receive the drugs,

10  correct?

11      A      Yes, sir.

12      Q      Would you have to go to Cristian Mendoza first?

13      A      Yes, sir.

14      Q      Okay.  And what would you do with the drugs that

15  you were purchasing from them?

16      A      Distribute them, use them.

17      Q      And who were you distributing them to?  Who were

18  you selling them to?

19      A      A guy named Justin.  Justin -- I can't remember

20  his name.

21      Q      Do you remember an individual by the name of Tyton

22  Hester?

23      A      Yes, sir.

24      Q      Did you distribute to him?

25      A      Yes, sir.

1    Q    And when you say Justin, is that Justin Billy?

2    A    Yes, sir.

3    Q    Did you distribute to him?

4    A    Yes, sir.

5    Q    Do you know where they would come from to receive

6    the drugs?

7    A    Sherman.

8    Q    So you sold the drugs that you received from

9    Daniel and Cristian Mendoza to Tyton Hester and Justin Billy?

10    A    Yes, sir.

11    Q    Did you also know an individual that went by Spook

12    or Spook Diaz?

13    A    Yes, sir.

14    Q    Was he also a customer of yours?

15    A    Yes, sir.

16    Q    Where was he?

17    A    West Texas.

18    Q    And how many times did you sell to him?

19    A    Twice.

20    Q    And how -- why did you stop meeting your

21    customers?

22    A    The second time I went with Big C, and he never

23    called me no more after that.  He was going with Big C.

24    Q    When you say he was going with Big C, he was going

25    with Cristian Mendoza and Daniel Mendoza?

1    A    Yes, sir.

2    Q    So basically they undercut you?

3    A    Yes, sir.

4    Q    Now what were some of the locations or the spots

5  that you went to receive the drugs?

6    A    The apartment and a house.

7    Q    Okay.  And that's where you would meet them and

8  receive the drugs?

9    A    Yes, sir.

10    Q    And had you ever seen firearms there at those

11  locations?

12    A    A couple of times, yes.

13         MR. GONZALEZ:  That's all I have.  I'll pass this

14    witness.

15                    CROSS-EXAMINATION

16  BY MR. MULDER:

17    Q    Sir, my name is Chris Mulder.  I just have a

18  couple of quick questions for you.

19         The photographs that you identified as workers

20  for Cristian and Daniel Mendoza; is that right?  Those three

21  individuals?

22    A    Yes, sir.

23    Q    How do you know them to be workers of Cristian and

24  Daniel?  What was their financial arrangement, do you know?

25    A    What do you mean by that?

1    Q    I mean, how much money did they make?

2    A    Oh, I don't know what they made, a couple hundred.

3    Q    Are you just guessing?

4    A    Yeah.

5    Q    And what did they do at the apartment?  Did they

6    just watch TV, or collect money from you, or what was their

7    job exactly?  Do you know?

8    A    Open the door.  They let in the customers.  Give

9    them the drugs and let them go.

10   Q    Did you ever call the house or call that apartment

11   direct and not deal with Cristian Mendoza?

12   A    No, sir.

13   Q    No?  You also dealt with Cristian Mendoza?

14   A    Yes, sir.

15   Q    Would he personally bring the drugs over, or would

16   the drugs already be at the house?

17   A    Both.

18   Q    Sometimes they would already be there?

19   A    Yes, sir.

20   Q    But you don't know -- well, I guess what I'm

21   getting at -- how many different kinds of drugs did you buy

22   out of that apartment?

23   A    Heroin, meth, coke, weed.

24   Q    Okay.  Pills?

25   A    Pills.

1     Q     Okay.  Were any of those -- the weed, we'll just

2  take that as an example.  Did you buy that direct from Big C?

3  It was his pot, right?

4     A     The weed?

5     Q     Yeah.

6     A     It was at the spot, so it would be for him.

7     Q     I'm sorry?

8     A     It was dealing with the spot, the spot or with

9  Cristian, wherever they told me to go to.

10     Q     But how do you know that the marijuana belonged to

11  Cristian?  Do you?

12     A     I would see him drop it off right there.

13     Q     You would see him bring the marijuana?

14     A     Yeah.

15     Q     How many times?

16     A     Every time I was there.

17     Q     I thought you said it was already at the spot?

18     A     I'm saying when I be there he would drop it off to

19  leave it in there.  And whenever -- when I go buy it, it would

20  be there sometimes.  If they run out, I go get it from him.

21     Q     Same thing with the pills?

22     A     Same thing with everything.

23     Q     Same thing with everything.  He would either be

24  there or he would have to bring it by?

25     A     Yeah.

1    Q    Well what -- you got 20 years?

2    A    Yes, sir.

3    Q    What is your understanding of how much time they

4 are going to cut off your sentence after today?

5    A    There is no understanding.

6    Q    What do you hope?

7    A    Get it cut in half.

8    Q    Okay.

9         MR. MULDER:  I don't have anything further.

10                   CROSS-EXAMINATION

11 BY MR. JENKINS:

12    Q    Mr. Ordaz, my name is Robert Jenkins.  I just have

13 a couple of questions as well.

14         You said that when you would want to acquire some

15 pot, you would call Cristian Mendoza; is that correct?

16    A    Yes, sir.

17    Q    And then you would go to one of the locations he

18 told you to go to and pick it up?

19    A    Yes, sir.

20    Q    And then you would pay -- who did you pay?

21    A    I paid all of them before.

22    Q    Whoever was there?

23    A    Whoever -- yes, sir.

24    Q    Okay.  And you said that you had a client -- I

25 think you said his name was Spook, in West Texas; is that

1 right?  What was his name?

2     A     Spook.

3     Q     All right.  And you said that he became a customer

4 of Big C; is that correct?

5     A     Yes, sir.

6     Q     And you said -- I believe you said a couple --

7 every time you wanted to get something, you would call

8 Cristian Mendoza, and then would go to various locations to

9 pick it up?

10     A     Yes, sir.

11           MR. JENKINS:  I don't have any further questions.

12           MR. GONZALEZ:  Nothing further.

13           THE COURT:  I have a question.  Who is Big C?

14           THE WITNESS:  The person in the photo.

15           THE COURT:  Okay.  That was Mr. Christian

16     Sorto-Villatoro; is that right?

17           THE WITNESS:  I don't know his full name, Your

18     Honor.

19           THE COURT:  Okay.

20           MR. GONZALEZ:  Can we show Government's Exhibit 8.

21                 REDIRECT EXAMINATION

22 BY MR. GONZALEZ:

23     Q     Do you recognize that individual?

24     A     Yes, sir.

25     Q     Who is that?

```
 1        A       Big C.
 2                THE COURT:  Okay.  Thank you.
 3                All right.  We need to take a break.
 4                            (Recess)
 5                MR. GONZALEZ:  Your Honor, can we swear in the
 6        witness?
 7                THE COURT:  Oh, I thought I was waiting for
 8        somebody.
 9                MR. GONZALEZ:  No, the witness is here.  We're
10        waiting for the defendants.
11                THE COURT:  Oh, we are waiting for them.  Okay.
12        We can swear in the witness though.
13                MR. GONZALEZ:  The government calls Lieutenant
14        Sillivan.
15                THE CLERK:  You do solemnly swear that the
16        testimony you shall give in the case now on hearing shall
17        be the truth, the whole truth, and nothing but the truth,
18        so help you God.
19                THE WITNESS:  Yes, ma'am.
20                            (Pause)
21                        (Defendant's present)
22                MR. GONZALEZ:  May I proceed, Your Honor?
23                THE COURT:  Yes.
24                        JUSTIN SILLIVAN,
25        after having been sworn, testified as follows:
```

DIRECT EXAMINATION

BY MR. GONZALEZ:

    Q    Sir, would you please state your full name for the Court and the record.

    A    Justin Sillivan.

    Q    Spell your last name, please.

    A    S-I-L-L-I-V-A-N.

    Q    And how are you employed?

    A    I'm a lieutenant for Bowie County Correctional Center.

    Q    How long have you been so employed?

    A    Seven, going on eight years.

    Q    And pursuant to your duties with the Bowie County Correctional Center, are you familiar with an individual named Cristian Mendoza?

    A    Yes, sir.

    Q    Do you see that individual in the courtroom today?

    A    Yes, sir.

    Q    Would you point to where he's seated and indicate an article of clothing that he's wearing.

    A    White and black jumpsuit.

    MR. GONZALEZ:  Your Honor, may the record reflect that the witness has identified the defendant, Cristian Mendoza?

    THE COURT:  Yes.

1     Q    (By Mr. Gonzalez) Now on September 9th of this

2  year did you have occasion to search the cell where the

3  defendant, Cristian Mendoza, was housed?

4     A    Yes, sir.

5     Q    And why did you do that?

6     A    The warden from Fannin County called Bowie County

7  Correctional Center, Warden Wilson, and advised him that there

8  was an inmate incarcerated with us posting pictures on

9  Facebook.  Warden ordered me to conduct a search of that

10  housing unit that Cristian Mendoza was in.

11         Upon searching the housing unit, four cell phones

12  were found in the unit, with a cell phone being found under

13  Cristian Mendoza's rack in between the mattress and the

14  sheets.

15     Q    So in proximity to the defendant, how close was

16  he?

17     A    He was laying on top of it.

18     Q    The phone that was found in his bunk by his --

19  well, in his bunk area.  Was it underneath him?

20     A    Yes, sir.

21     Q    And that's where you found the phone, correct?

22     A    Yes, sir.

23     Q    So that phone was confiscated and turned over to

24  the U.S. Marshal Service, correct?

25     A    Yes, sir.

1    Q    Did Mr. Mendoza claim ownership of the vehicle?  I
2    mean of the phone?
3    A    No, sir.
4    Q    Did you have any further involvement with the
5    defendant after finding that particular cell phone in his
6    bunk?
7    A    No, sir.
8    Q    But it was you that found it, correct?
9    A    No, sir.
10   Q    Who found it?
11   A    Officer Gail.
12   Q    And were you present when they found it?
13   A    Yes, sir.
14   Q    And did you see it removed from the defendant's
15   bunk?
16   A    Yes, sir.
17   Q    And you saw that he was laying on it at the time,
18   correct?
19   A    Yes, sir.
20   Q    And when you went into the cell, where was the
21   defendant?
22   A    He was laying on his bunk, sir.
23   Q    And the phone was underneath him?
24   A    Yes, sir.
25   Q    Okay.

1          MR. GONZALEZ:  That's all I have, Your Honor.

2     Nothing further.

3                    CROSS-EXAMINATION

4   BY MR. MULDER:

5     Q     Sir, my name is Chris Mulder, and I have just a

6   couple of questions for you about this search.

7          At first you told us that the Sheriff -- is it

8   the Sheriff of Fannin County or the Warden?

9     A     The Warden.

10    Q     Okay.  The Warden of the Fannin County

11  Correctional, called your warden?

12    A     Yes, sir.

13    Q     And said someone is posting pictures to Facebook?

14    A     Yes, sir.

15    Q     Who was posting pictures to Facebook?  Cristian

16  Mendoza?

17    A     No, sir.

18    Q     A different inmate?

19    A     Yes, sir.

20    Q     Okay.  And obviously -- you found how many phones

21  in that tank?

22    A     Four cell phones, sir.

23    Q     How many inmates housed in the tank total?

24    A     At the time I believe there was 23.

25    Q     Okay.  Did you find the phone that was posting the

 1  photos to Facebook?

 2      A      I would not know that information.

 3      Q      Well, I mean if you participated in the search,

 4  it's the phone with the pictures that belongs to the guy that

 5  the sheriff -- or that the warden called about, right?

 6      A      Say that one more time, please.

 7      Q      Well, do you know the name of the person who was

 8  posting the photos to Facebook?

 9      A      Yes, sir.

10      Q      Okay.  Did you find his phone?

11      A      We found four phones.  All four phones had

12  passwords.  I do not have the capability or the access to open

13  those phones.

14      Q      Okay.  So the phone -- okay, gotcha.  What was the

15  name of the guy who was posting photos?

16      A      Justin Billy.

17      Q      Oh, he's another codefendant here on this

18  Indictment's?

19      A      I learned that today.

20      Q      Okay.  So he was posting photos from Bowie County

21  on a phone, allegedly; is that right?

22      A      Yes, sir.

23      Q      But you weren't able to unlock the phones and find

24  out if it was true or not?  At least you personally?

25      A      Yes, sir.

1    Q    You didn't find the phone in Cristian Mendoza's
2    bunk, but you watched it be found?
3    A    Yes, sir.  Officer Gail found it.
4    Q    Okay.  And no doubt about it, it was underneath
5    him?
6    A    Yes, sir.
7    Q    Was it under the mattress or under the sheets?
8    A    It was between the mattress and the sheets.
9    Q    On the -- just so I can visualize it -- mattress,
10   phone, sheets, top?
11   A    No.  Bunk, sheets, mattress -- or phone, mattress.
12   Q    Oh, so it was under the mattress?
13   A    Yes, sir.
14   Q    But between some sheets?
15   A    Yes, sir.
16   Q    So as not to be visible from underneath, I guess?
17   A    Correct.
18   Q    What kind of phone was it?  Do you remember?
19   A    It was a black Smart phone.
20   Q    Okay.  All right.  Was anybody ever able to find
21   out how it got in there?
22   A    No, sir.
23   Q    I mean four phones and a charger, that's a pretty
24   big breach of security?
25   A    Absolutely.

1      Q      Is there an ongoing investigation of any kind?

2      A      Sir, I reported my findings to the Captain and the

3   Warden of the facility, and they are conducting an

4   investigation on how the phones had gotten into the facility.

5      Q      Okay.  Did Mr. Mendoza deny possession of the

6   phone?

7      A      Yes, sir.

8      Q      And did he deny knowledge of the phone?

9      A      Yes, sir.

10      Q      He said it wasn't mine?

11      A      Yes, sir.

12      Q      Did he tell you who he thought it belonged to?

13      A      No, sir.

14      Q      Did you ask?

15      A      Yes, sir.

16      Q      And what did he say?

17      A      It's not his.

18      Q      That's it?

19      A      Yes, sir.

20      Q      Okay.

21             MR. MULDER:  That's all.  No more questions.

22             MR. GONZALEZ:  No further questions, Your Honor.

23   May this witness be excused?

24             THE COURT:  Yes.

25             MR. GONZALEZ:  No further witnesses, Your Honor.

1          THE COURT:  Okay.

2          MR. MULDER:  Judge, if I might.

3          THE COURT:  Yes.

4          MR. MULDER:  I'm sorry, this last witness, I have

5     one last question for him.  Can I get him in the hallway?

6          THE COURT:  Okay.

7                    (Pause)

8     Q    (By Mr. Mulder)  Sorry about that.  I know you

9  were excited to get out of here.

10         One last thing.  The cells for the tanks are

11 under video surveillance, aren't they?

12    A    Yes, sir.

13    Q    So there would be a video of the search and the

14 finding of the cell phone, correct?

15    A    Not of the phone being found on Mendoza's

16 property.  He's -- where his bunk was placed is towards the --

17 the restrooms and the showers.  And the camera actually only

18 shows the day room and not the housing -- not where they

19 sleep.

20    Q    Okay.  So that would show everybody -- when you

21 come in to conduct the search, you order everybody off their

22 bunks; is that right?

23    A    Yes, sir.

24    Q    And then you search their property?

25    A    Yes, sir.

1     Q    Okay. Would it show that initial part of the

2 search, or everybody getting out of his bunk? Would it show

3 Mendoza getting off his bunk?

4     A    Yes, sir. It would show everyone getting off

5 their bunks going towards the front.

6     Q    Have you made that video available to the

7 government?

8     A    No, sir.

9     Q    And you don't have a copy of the video, I guess?

10    A    No, sir.

11    MR. MULDER: That's all.

12    THE COURT: Mr. Gonzalez?

13    MR. GONZALEZ: Nothing further.

14    MR. MULDER: I promise I'm done.

15    THE COURT: Can the witness be released now?

16    MR. MULDER: Yes.

17    THE COURT: Thank you.

18    THE WITNESS: Thank you.

19    THE COURT: All right. Let's have argument -- oh,

20    no. Let's go back.

21    Did you look at the -- did you look at the thing

22    from probation about the online material?

23    MR. MULDER: Yes, ma'am. And if I could just kind

24    of clarify with probation.

25    THE COURT: Okay.

1    (Pause)

2    MR. MULDER:  And I hate to seem like I'm splitting

3    hairs, but I just want the report to be accurate for the

4    Bureau of Prisons and for the classification purposes.

5    It looks like in paragraphs 52 and 53, it

6    references two cases.  They were filed simultaneously.

7    It's the same transaction, same criminal episode.  And

8    the first one was his -- just call it 533, according to

9    the paperwork.  He was in possession of marijuana.  And

10   the one docketed 534 is possession of drug paraphernalia.

11   Probation was able to supply whatever counsel --

12   sort of a generic form that defendants -- that they sign,

13   that allows them to negotiate and speak directly with the

14   prosecution.  And I've got no objection to that.  He

15   signed it.  There's no fingerprint on it, but I'm not

16   going to quarrel with it.

17   And then there's one judgment supplied in cause

18   number 2016-533.  And that one, according to the judgment

19   that was -- the only judgment -- there is no judgment to

20   534.  This one for 533 references the possession of

21   paraphernalia.  So it looks like in -- on the computer

22   records that they were able to print out, it looks like

23   2016-534 is in fact the possession of paraphernalia.

24   So what we've got, is we've got some paperwork

25   from this court in Oklahoma that doesn't seem to

correspond with their computer records.  And it's pretty
apparent that this is riddled with typos because this
judgment orders itself to be concurrent with itself.  It
references its own cause number, which is clearly a
mistake somehow.

So what we've -- what we've proposed to do -- and
correct me if I get it wrong -- but we believe that
paragraph 53 should in fact have the criminal history
point because that's the judgment that is proveable, and
that the possession of marijuana should not have the
criminal history point because it's part of the same
single sentence.

THE COURT:  Probation agree with that?

PROBATION OFFICER:  Yes, Your Honor.

THE COURT:  Okay.  Well I'll change mine to show
that the paragraph 52 is receiving zero points, but that
53 is receiving one point.

MR. MULDER:  Yes, ma'am.  And I'll withdraw my
objection to 52 based on that.

THE COURT:  Right.  Okay.  But you're still
objecting to 53?

MR. MULDER:  I can't object to 53.

THE COURT:  Okay.  So we've got one point on 53,
looks like he waived counsel.  Okay.

MR. MULDER:  Yeah.

1      THE COURT:  All right.  So we've got that one
2  figured out.
3      So going back to the objection about being too
4  old, I think there was testimony that would link
5  Mr. Mendoza's involvement as early as 2015/2016.  I think
6  that one of the witnesses testified to that, and
7  certainly the agent did that.  So I think that objection
8  should be overruled.
9      Do you have anything more on that?
10     MR. MULDER:  No, Your Honor.
11     THE COURT:  All right.  And then for the gun
12  situation.  Well, there was a gun in the stash house that
13  he was clearly involved in, and then there was a gun
14  behind his bed in his house.  So I think that one counts,
15  too.  So either one I think he should get a gun
16  enhancement.
17     MR. MULDER:  I understand.
18     THE COURT:  Which ever one.  So that objection is
19  overruled on the gun enhancement.
20     Okay.  That gets rid of the defendant's
21  objections.
22     Now we're back on the government's objections.  So
23  there's been a lot of testimony about that.  Do you want
24  to have closing argument about that?  And when you do, I
25  know we're talking about leadership role.  I think I need

1       to know who -- who you think these participants are.  And
2       it has to be four or more participants, and there are
3       certain roles that are played.  It can be organizer,
4       leader, manager or supervisor.  So you just need to keep
5       this in mind.  I need to know who are the five people
6       that he's talking about, that you contend.
7               Okay.  Do you want to go first then, Mr. Gonzalez?
8               MR. GONZALEZ:  Yes, Your Honor.
9               Addressing who are the five people.  Well, you
10      heard the testimony of two of the people that are
11      involved in this conspiracy here today.  You've heard
12      that the two defendants were involved with them.  That's
13      four people.  And you also heard that the distribution
14      was going to Sherman, which involved an individual by the
15      name of Tyton Hester, and another individual by the name
16      of Justin Billy.  So those were all part of this
17      conspiracy.
18              You also heard about the workers at the stash
19      house.  Those were all individuals in this conspiracy.
20      So we have more than five people involved in this
21      conspiracy.
22              THE COURT:  So those workers would be that Mr. E
23      and C, the Elias Mendoza and Christian Sorto-Villatoro.
24      What's the situation with Mr. Aguilar?  He seems to have
25      been --

1      MR. GONZALEZ:  There was testimony --

2      THE COURT:  -- Mr. Aguilar was also involved in

3  that.  Then there was somebody named Mr. Flores.  What's

4  the situation with him?

5      MR. GONZALEZ:  Well, Mr. Flores testified that

6  there was another customer in -- he said West Texas.  He

7  was a customer of Mr. Ordaz at first, and then he got

8  undercut, and they started -- the Mendoza brothers

9  started supplying him.  That's another person in this

10  conspiracy.  His actual name is Julian Diaz. he's also

11  indicted in the case.

12      THE COURT:  Is he Mr. Flores?  Or is Mr. Flores

13  somebody else altogether?

14      MR. GONZALEZ:  Mr. Flores is someone else.

15  Mr. Flores is a person that was arrested at the stash

16  house when they executed the search warrant.  He was

17  another person that was buying drugs there at the stash

18  house.  He's pled guilty before this Court and received

19  14 years.

20      THE COURT:  Okay.  You contend he's another

21  participant?

22      MR. GONZALEZ:  Correct.  He's another participant.

23      So those are all the participants, and that's more

24  than enough for the five people in a conspiracy.

25      In regards to their leadership role, I think the

1    testimony has been from the witnesses, fairly

2    consistently, that individuals in Sherman would use

3    middlemen to get the drugs, and then buy the drugs and go

4    back.  And that was the testimony that the Court heard

5    here today, that phone calls would be made to Cristian

6    Mendoza or to Daniel Mendoza to receive the drugs.  They

7    would then either meet them and deliver the drugs to

8    them, or direct them over to the stash house where they

9    had the workers distributing the drugs.

10        So we believe that based on that testimony, and

11   also based on the recordings that the Court heard here

12   today when they did the control buy.  And in those

13   recordings you heard the cooperating defendant who was

14   acting as a cooperating source at that time, make the

15   phone calls.  Calls Cristian Mendoza.  Cristian Mendoza

16   says go to the spot.  He then goes to the spot and

17   eventually gets the grams of heroin that he was looking

18   for.

19        So the testimony of the witnesses is consistent

20   with the testimony of the agent as to what happened that

21   day.  The quantities of drugs that were testified to were

22   the quantities of drugs that both the defendants pled

23   guilty to.  And the items that were found at the stash

24   house were similar to the items that were found at the

25   house where they were residing that got searched also.

1      So we believe that the totality of the testimony

2    that the Court has before it, it can clearly make a

3    determination that both of these defendants were leader/

4    organizers, so we would argue that they both are leader/

5    organizers and merit an increase for that.

6           THE COURT:  Okay.  I'll hear from Mr. Mulder.

7           MR. MULDER:  Your Honor, as far as Cristian

8    Mendoza is concerned, you heard this wasn't much of an

9    organized organization.  And I know it doesn't need to

10   be, but this was not a terribly complex operation that

11   was running out of any of these houses.  It was a couple

12   of apartments, and I think the defendants' own home.

13          It looks like his responsibility was to, you know,

14   re-up the house from time to time when people would call

15   him.  It's unclear from the -- at least it's not totally

16   clear from the testimony of the witnesses whether all

17   these guys that were in the apartment were workers or

18   they were just present, they were just hangers on, or

19   they were just users.

20          You know, I think at best they might get a two

21   point leadership enhancement, but I don't -- I don't see

22   this -- I just don't see Cristian Mendoza as a leader or

23   organizer of anything other than the three people

24   involved.  I mean there were two guys sitting on the

25   drugs at the apartment, and Mendoza would get an initial

call. They said most of the time, but not every time.
Sometimes they would just deal directly with the guys at
the apartment. So I guess he's supervising them to some
degree in that he brings the drugs over, but I don't see
any kind of -- and I haven't heard any testimony from
them that they would be paid, and they got a cut, and
they got a per diem to be there at the apartment.

So I guess --

THE COURT: Do you contend that they would have
to be involved in supervising these people for the
enhancement to apply?

MR. MULDER: Well, I mean they are saying that --
the government is saying that -- I just want to know who
Cristian is supposed to be supervising. Was it E and Big
C?

THE COURT: But I guess the question is, is that
important? You obviously think it is.

MR. MULDER: I do. I mean it could be a leader of
nobody organizing.

MR. GONZALEZ: Your Honor, in response to that, I
would argue that he is organizing. He's the one that got
the cousin to rent the apartment for that purpose. So
he's organizing them to distribute the drugs. And in the
calls that -- that were played in this courtroom, they
said, call Trigger. And Trigger is the defendant,

1    Cristian Mendoza.  And that's who they call to get the

2    transaction going.  So he is supervising the individuals

3    at the apartment and he's organizing also.  He's

4    organizing that apartment so that it can be used for that

5    specific purpose.

6             THE COURT:  Okay.  Is that it?

7             MR. MULDER:  That's all.

8             THE COURT:  Okay.  So you've already talked about

9    Daniel Mendoza.  Mr. Gonzalez, is that all you want to

10   say about Daniel Mendoza before Mr. Jenkins?

11            MR. GONZALEZ:  Well, the argument for Daniel

12   Mendoza is the same, Your Honor.  You heard the testimony

13   when Cristian Mendoza was not available, they called

14   Daniel Mendoza, or when Cristian Mendoza wanted the drugs

15   delivered, he would send his brother.  They were acting

16   functionally equivalent.  They were acting as partners in

17   this.  They had the individuals at the stash house

18   operating for them.  They would fill the stash house with

19   drugs they would distribute.  If they needed anymore

20   drugs, they would go find more drugs with Cristian and

21   Daniel Mendoza.  And when he was arrested, he said all

22   the drugs that are there at the house belonged to me.

23   And it was heroin that was found with the drugs at the

24   house.  When he gave his statement during his proffer he

25   said he was moving kilo quantities of heroin.  That's

consistent with what the witnesses were saying about the involvement of the Mendoza brothers in the distribution of large quantities of drugs.

So we believe that they are functionally equivalent as to being leader/organizers for that particular stash house with the same employees, with the same customers.

MR. JENKINS:  Your Honor, I think we did hear from all the witnesses today that he would call Cristian, and if Cristian wasn't available he would tell you to call Daniel.  And that obviously means that Daniel is not in a leadership position.  He's, at best, in a secondary position.  I would say he's quite likely lower than the guys at the apartment that we are apparently calling workers.  But Big C and E were able to -- if their product was already there, the people could go there and get it directly without involving Daniel at all.  He was essentially showing up as a proxy for Cristian when Cristian wasn't available.

And he did -- when he was arrested, he admitted that he was involved in the drug dealing conspiracy because he was.  He was being honest.  But he wasn't in a leadership role.  He wasn't supervising.  He wasn't organizing.  He was involved.  He was there, and he admitted it because he was being truthful.  But he did

1    not supervise, organize, or in any other way -- he didn't

2    recruit.  He was simply a person who was really at the

3    same level as we are calling E and Big C.  He did have

4    that participation, but he was not in any way in a

5    leadership role.

6              THE COURT:  Anything else?

7              MR. JENKINS:  No.

8              THE COURT:  Well, I think that Mr. Gonzalez's

9    objection should be sustained.  And I think based on the

10   testimony I've heard, that Mr. Cristian Mendoza had a

11   leadership role to the extent he should get a three point

12   enhancement, and I think Mr. Daniel Mendoza had a

13   leadership role maybe more managerial, to where he should

14   get a two point enhancement.  And so those are my

15   findings sustaining that objection.

16             Okay.  Let's continue.

17             Now there were plea agreements in both cases, as I

18   recall.  They just weren't to a particular amount; is

19   that correct?  Well there were -- okay.  But they didn't

20   agree to these different enhancements.

21             So to the extent the plea agreements were

22   previously -- that I deferred acceptance of those plea

23   agreements, they are now accepted and the judgment and

24   sentence will be consistent with them.

25             The Court finds the information contained in the

1    presence report has sufficient indicia of reliability
2    to support its accuracy.  Except for the objections that
3    I sustained.

4          The Court adopts the factual findings, undisputed
5    facts, and guideline applications in the presentence
6    report, except for those ordered by the objections that
7    were sustained.

8          Based upon a preponderance of the evidence
9    presented and the facts in the report, while viewing the
10   sentencing guidelines as advisory, the Court concludes
11   that with respect to Mr. Cristian Mendoza, the total
12   offense level is 46.  I'm not sure it even goes up that
13   high because the guideline manual I think is 43.  But I
14   don't know.  With a criminal history level of 3, which
15   provides for an advisory guideline range of life
16   imprisonment.

17         As to Mr. Daniel Mendoza, the Court finds that the
18   total offense level is 41, with a criminal history level
19   of 3, which provides for an advisory guideline range of
20   360 years to life in prison.

21         Does defendant's counsel wish to make any remarks
22   on behalf of the defendant, Mr. Cristian Mendoza?

23         MR. GONZALEZ:  Your Honor, just briefly.  Could I
24   make a correction on what you just stated?  He also pled
25   guilty to Count Three, which would be another 60 months

1　　　on top of --

2　　　　　THE COURT:  Oh, exactly.  Yes.  As to Count -- as

3　　　to Count Three, that would be an additional five years

4　　　imprisonment consecutive to Count One.  That's correct.

5　　　Okay.

6　　　　　MR. JENKINS:  Yes.  As well, the criminal history

7　　　category is a level -- is a category 2.

8　　　　　THE COURT:  Category 2.  I'm sorry, that would be

9　　　a -- 39, but it got up to 41 -- let me redo Mr. Daniel

10　　　Mendoza.

11　　　　　Okay.  With respect to Mr. Daniel Mendoza, the

12　　　Court concludes the total offense level is 41, the

13　　　criminal history level is 2, which provides for an

14　　　advisory guideline range of 360 years to life.

15　　　　　That's as to Count One.  As to Count Three, the

16　　　Court finds that the total -- that the advisory guideline

17　　　range is 60 months, consecutive to Count 1.

18　　　　　Okay.  Let's continue now with any remarks with

19　　　respect to Mr. Cristian Mendoza.

20　　　　　MR. MULDER:  Yes, Your Honor.

21　　　　　I filed a sentencing memorandum but I'll just

22　　　summarize what I think is called for in a case like this.

23　　　　　It's sort of been my experience that it's unusual

24　　　to have a sentencing hearing like this with the

25　　　witnesses, and so I just don't want the Court to imagine

1    that -- and I don't believe that you will -- that
2    Cristian Mendoza is a bigger criminal than what the case
3    says he is.  Certainly, taking away his acceptance of
4    responsibility it is understandable, if you believe that
5    the cell phone found in his tank belonged to him in the
6    Bowie County jail.
7         And the leadership role, such as it is, I think
8    it's more of a disorganized confederacy than any kind of
9    well run criminal machine, in my opinion.  And I think
10   that he's already sentenced accordingly.
11        He's 23 years old.  He turned 23 in federal
12   custody.  And he's looking at now -- entirely to his
13   own -- because of his own poor decisions, he's looking at
14   a guideline sentence of life.  I think that's too much
15   for a kid -- a young man like Cristian Mendoza.  I mean
16   based on what his offense was, which is, you know,
17   basically running a trap house that sold heroin and
18   methamphetamine.  You know, I just think that is a
19   disproportional sentence.
20        The other people in the conspiracy got sentences,
21   or even the -- the people who got the more serious
22   sentences, of course a couple of them were lucky enough
23   to testify today, which will get a reduction.  But they
24   got things like 264, 240, 20, 25 years.  And they
25   cooperated and they will get their time cut, presumably,

1    or at least have that hope.  Cristian Mendoza did not

2    cooperate, so he understands that he's going to get what

3    he's going to get.  It will not be cut with any future

4    Rule 35 or anything else.

5        You know, in my sentencing memorandum I said that

6    I thought that 20 years would be sufficient in a case

7    like this.  After hearing the evidence, I could certainly

8    understand the Court if you believe that more than 20

9    years was appropriate, 25 or even 30.  But I think that a

10   sentence of life in prison is totally disproportionate to

11   what it was that Cristian Mendoza did.

12       He's young.  He's got a family.  You know, at

13   least give him some hope in prison of being able to get

14   out and be free again, and hopefully contribute in some

15   way to his family and society.

16       And I know that Mr. Mendoza has a brief statement

17   he would like to read to the Court that he prepared, as

18   well.  But anyway, his family -- both boys, they filled

19   up the back two rows here.  And they didn't do it because

20   they don't support Cristian Mendoza.

21       And I believe that you've read the letters that we

22   submitted, as well, which all point to this being a total

23   aberration to his family.  I mean they've got, you know,

24   service members, hard working members of the family.

25       And I think that there's some redemption out there

1    for Cristian Mendoza.  And I'm not telling you not to put

2    him in prison for a long time.  I think he's earned that.

3    But I don't think he's earned a life sentence.  And I

4    don't think that's consistent with other people that

5    you've sentenced to life.

6         THE COURT:  Okay.  Does Mr. Mendoza wish to make a

7    statement then?

8         DEFENDANT CRISTIAN MENDOZA:  First of all, I want

9    to apologize to the United States of America for the

10   mistakes I have made.  I'm not a bad person.  I just made

11   wrong choices.  I want to say I'm sorry to my brother for

12   setting a bad example.  I want to apologize to my family

13   and also to my four-year-old daughter.  I want to ask the

14   Court to have mercy on me.  And I want to overcome my

15   mistakes to become a better person in life.

16        MR. MULDER:  That's all, Judge.

17        THE COURT:  Okay.  Thank you.  Anything else?

18        MR. MULDER:  No.

19        THE COURT:  All right.  You can have a seat.

20        MR. MULDER:  Thank you.

21        THE COURT:  Okay.  I'll hear from Mr. Gonzalez

22   with respect to Mr. Cristian Mendoza.

23        MR. GONZALEZ:  Your Honor, we believe that the

24   sentence as calculated by the Court, as well as the

25   probation office is appropriate for this defendant.

1    Obviously, he was involved and in charge of this

2    organization.  So much as they try to minimize the level

3    of -- or the quantity of drugs that were being

4    distributed by this defendant, it was a substantial

5    amount of methamphetamine, and heroin, and other drugs

6    that would leave Dallas and go to other smaller

7    communities and have a significant impact, especially in

8    Sherman, Texas.

9         So we believe as calculated by the Court, the

10   level 46 which calls for a life sentence, is appropriate

11   for this defendant.  As the Court indicated, 46 is not

12   even on the scale.  43 is the top of the scale.  He's

13   well beyond that.  So we would ask the Court not to vary

14   or deviate, and to give the sentence as calculated by the

15   Court, of life.

16        THE COURT:  I want to hear from the next person.

17        MR. JENKINS:  Your Honor, you also received

18   letters from various people that know Daniel Mendoza.

19   And that's his family that's here, as well.  Obviously,

20   they are here to support both the brothers.

21        And Daniel Mendoza is even younger.  He's turned

22   20 while he's been incarcerated.  And I think we did

23   establish he had less of a role in this thing.  And

24   his -- again, apart from these bad decisions and apart

25   from following in the footsteps of his brother, he has a

1  shot at redemption.  He's a good kid that made a really

2  terrible mistake more than once.  And he could still have

3  some life in front of him if you saw fit.

4         I -- we came out at 360 months.  I think, again,

5  that is entirely too much for the level of participation

6  Mr. Mendoza did have.  The codefendant -- he only has one

7  codefendant in his particular Indictment that we have

8  sentenced for, which was 168 months.  That's Mr. Flores.

9  We know he was more involved than that.

10         We know that he's involved in this prior

11  Indictment, but I think he is similar to a lot of people

12  in the prior Indictment who we -- some of whom we heard

13  from today, that got 20 years, and then had the

14  opportunity to help themselves.  Mr. Mendoza was given

15  the opportunity to help himself and did not take

16  advantage of it.

17         But I think a sentence of 20 years, similar to

18  those people that he is similar to, that he has less life

19  experience than.  He's a much younger person, and he did

20  make some mistakes.  He made some bad choices.  But I

21  think -- I think a sentence of 20 years would be exactly

22  as long as he's been alive.  And in that sense, I think

23  that would be a fair sentence for his involvement.

24         And we just ask that you do show him some mercy.

25  And he does want to make a statement on his behalf.

1          THE COURT:  Very well.

2          DEFENDANT DANIEL MENDOZA:  My name is Daniel

3     Mendoza.  I apologize to the State.  I know y'all are

4     just doing your job.  I apologize to my family, putting

5     them through all this mess.  I just hope you give us

6     mercy.  That's all I ask for.

7          THE COURT:  Thank you.

8          MR. JENKINS:  Thank you, Your Honor.

9          THE COURT:  Anything more, Mr. Gonzalez?

10         MR. GONZALEZ:  Your Honor, In regards to Daniel

11    Mendoza, we would argue the same argument.  That the

12    defendant should get the sentence as calculated by the

13    Court.  The defendant was equally involved with the drug

14    industry, distributing large quantities of

15    methamphetamine and heroin.

16         He was given the opportunity to cooperate.  He was

17    given the opportunity to reduce his sentence.  But when

18    we went to interview him, he indicated that he wasn't

19    interested in talking to us anymore.  So he was given

20    that opportunity.  So now to complain that the other

21    people got less sentences who have been honest and have

22    cooperated honestly, I think shows the caliber of the

23    individual that's before us today.

24         So we believe that the sentence as calculated by

25    the Court is correct, and that he should be sentenced to

1    that range of 360 to life, with the additional 60 months

2    added to it for the possession of a firearm.

3        THE COURT: All right. Does counsel know of any

4    reason -- anything else?

5        MR. GONZALEZ: Nothing further, Your Honor.

6        THE COURT: Any reason why sentence should not be

7    imposed at this time?

8        MR. GONZALEZ: Not from the government.

9        THE COURT: As to Mr -- well, I'll try to do them

10   both at the same time.

11       Pursuant to the Sentencing Reform Act of 1984, and

12   having considered the factors noted in 18, U.S.C. Section

13   3553(a), and having consulted the advisory sentencing

14   guidelines, it is the judgment of the Court that the

15   defendant, Cristian Mendoza, is hereby committed to the

16   custody of the Bureau of Prisons for 420 months on Count

17   One of the First Superseding Indictment. This does

18   represent a variance due in part to his age, and concern

19   of the disparity of sentence with the other defendants.

20       As to Mr. Daniel Mendoza, pursuant to the

21   Sentencing Reform Act of 1984, and having considered the

22   factors noted in 18, U.S.C. Section 3553(a), and after

23   having consulted the advisory sentencing guidelines, it

24   is the judgment of the Court that the defendant, Daniel

25   Mendoza, is hereby committed to the custody of the Bureau

1    of Prisons to be imprisoned for a total term of 384

2    months.  The term consists of 324 months on Count One,

3    and a consecutive term of 60 months on Count Three.  A

4    total of 384.  This also represents a variance, basically

5    for the same reasons, the young age.  And Mr. Daniel

6    Mendoza does have a lesser role I think than the older

7    brother in his situation, and the concern of disparity of

8    sentences with other codefendants in the case.

9         So, 420 for Mr. Cristian Mendoza, 384 for

10   Mr. Daniel Mendoza.

11        This sentence is imposed within an advisory

12   guideline range that's greater than 24 months, but there

13   was a variance and the specific sentence is imposed after

14   consideration of the factors set forth in 18, U.S.C.

15   Section 3553(a).

16        The Court recommends to the Bureau of Prisons that

17   the defendants receive appropriate drug treatment while

18   in prison.

19        The Court finds the defendants do not have the

20   ability to pay a fine, the Court will waive the fine in

21   this case.

22        It is ordered the defendants pay the United States

23   a special assessment -- Mr. Cristian Mendoza, a special

24   assessment of $100 which is due and payable immediately.

25   And Mr. Daniel Mendoza, a special assessment of $200

1    which is due and payable immediately.

2           The defendants are ineligible for all federal

3    benefits listed in 21, U.S.C. Section 862(d) for a period

4    of five years from the date of this order.

5           Upon release from imprisonment, the defendant

6    shall be on supervised release for a term of five years.

7           Within 72 hours -- this term consists -- with

8    respect Mr. Daniel Mendoza, five years on each of Counts

9    One and Three, those terms to run concurrently.

10          Within 72 hours of release from the custody of the

11   Bureau of Prisons the defendants must report in person to

12   the probation office in the district to which the

13   defendants are released.

14          The defendant must not commit another federal,

15   state, or local crime, and must comply with the standard

16   conditions that have been adopted by this Court.

17          In addition, the defendant must comply with the

18   applicable mandatory conditions and the following special

19   conditions.

20          The defendant must provide the probation officer

21   with access to any requested financial information for

22   purposes of monitoring the defendant's efforts to obtain

23   and maintain lawful employment.

24          The defendant must participate in a program of

25   testing and treatment for substance abuse and follow the

1 rules and regulations of that program until discharged.

2   The probation officer, in consultation with the

3 treatment provider, will supervise the defendant's

4 participation in the program.

5   The defendants must pay any costs associated with

6 treatment and testing.

7   As to Mr. Cristian Mendoza, the Court finds this

8 to be a reasonable sentence in view of the nature and

9 circumstances of the offense, entailing the defendant's

10 participation in a drug trafficking conspiracy involving

11 the distribution of 45 kilograms or more of a mixture or

12 substance containing a detectable amount of

13 methamphetamine, or 4.5 kilograms or more of

14 methamphetamine (actual).  The defendant's supplying

15 coconspirators with kilogram quantities of

16 methamphetamine from various sources which was imported

17 from Mexico for distribution to others in the Eastern and

18 Northern Districts of Texas.  His serving as a Dallas-

19 based source of supply of methamphetamine and heroin with

20 coconspirators for the past two to three years.  His

21 maintaining a stash house at an apartment for the

22 purposes of storing and distributing methamphetamine and

23 heroin.  A confidential source's purchasing black tar

24 heroin from individuals who worked at the stash house

25 which was obtained from the defendant's residence.  The

1    confidential source's observing a Glock pistol and an

2    individual counting money at the stash house.  The

3    discovery of a substance that appeared to be heroin,

4    marijuana, and a digital scale, a money counter, and drug

5    ledger during the execution of the search warrant at the

6    defendant's residence.  The discovery of what appeared to

7    be black tar heroin, methamphetamine, and marijuana,

8    Xanax pills, digital scales, a loaded Ruger pistol, drug

9    ledgers, and U.S. currency during the execution of the

10   search warrant at the stash apartment.

11        His -- and I would add, his criminal history

12   including prior convictions of assault causing bodily

13   injury, and the unlawful delivery of a controlled

14   substance, possession of marijuana (2), unlawful

15   possession of drug paraphernalia, his being on probation

16   at the time of the instant offense.  His reported

17   affiliation with a street gang and his history of

18   substance abuse.  It will serve as just punishment,

19   promote respect for the law, and deter future violations

20   of the law.

21        Although the Court finds the guideline

22   calculations announced at the sentencing hearing to be

23   correct, to the extent they are incorrectly calculated

24   the Court would have imposed the same sentence without

25   regard to the applicable guideline range, in light of the

1    factors set forth in 18, U.S.C. Section 3553(a).

2           As to Mr. Daniel Mendoza, the Court finds this to

3    be a reasonable sentence in view of the nature and

4    circumstances of the offense entailing the defendant's

5    participation in a drug trafficking conspiracy involving

6    the distribution of 45 kilograms or more of a mixture or

7    substance containing a detectable amount of

8    methamphetamine, or 4.5 kilograms or more of

9    methamphetamine (actual).  The defendant's supplying

10   coconspirators with kilogram quantities of

11   methamphetamine from various sources which was imported

12   from Mexico for distribution to others in the Eastern and

13   Northern Districts of Texas.  The possession of two

14   handguns in furtherance of the conspiracy.  The discovery

15   during a traffic stop in July of 2017 with a bag

16   containing 28.1 grams of methamphetamine on the

17   floorboard near where he had been seated in the vehicle,

18   and 10.8 grams of marijuana on his person.  The recovery

19   of heroin from a plastic bag in a shoebox, and another

20   bag containing heroin inside the box in a dresser in his

21   bedroom at his residence in October of 2018.  His using

22   the prior, to store the narcotics.  The discovery of

23   heroin, methamphetamine, marijuana, Xanax pills, digital

24   scales, a loaded Ruger pistol, drug ledgers, and U.S.

25   currency during the execution of the search warrant at

1    the stash apartment in October, 2018.  And his prior

2    convictions for possession of a controlled substance and

3    unlawfully carrying a weapon, and his history of daily

4    substance abuse as well as his reported affiliation with

5    a street gang.

6          Also as to Mr. Cristian Mendoza, I failed to point

7    this out, but his leadership role in the conspiracy for a

8    three point enhancement.

9          And as to Mr. Daniel Mendoza, his playing a

10   managerial role in the conspiracy for a two point

11   enhancement.

12         It will serve as just punishment, promote respect

13   for the law, and deter future violations of the law.

14         Although the Court finds the guideline

15   calculations announced at the sentencing hearing to be

16   correct, to the extent they are incorrectly calculated,

17   the Court would have imposed the same sentence without

18   regard to the applicable guideline range in light of the

19   factors set forth in 18, U.S.C. Section 3553(a).

20         Each of you have a right to appeal your conviction

21   if you believe your guilty plea was somehow unlawful or

22   involuntary, or if there's some other fundamental defect

23   in the proceedings that was not waived by your guilty

24   plea.

25         You have a statutory right to appeal your sentence

1    under certain circumstances, particularly if you think
2    this sentence is contrary to law.
3         The defendant, however, may waive those rights as
4    part of a plea agreement, and you've entered into a plea
5    agreement which waives certain rights to appeal your
6    conviction and sentence.
7         With the exception of the reservation of right to
8    appeal on specified grounds set forth in the plea
9    agreement, you've waived any appeal, including collateral
10   appeal, of any error which may have occurred surrounding
11   the substance, procedure, or form of the conviction and
12   sentence in this case.
13        Such waivers are generally enforceable, but if you
14   believe the waiver is unenforceable, you can present that
15   theory to the appellate court.
16        With few exceptions, any notice of appeal must be
17   filed within 14 days of judgment being entered in your
18   case.
19        If you are unable to pay the cost of an appeal,
20   you may apply for leave to appeal in forma pauperis.  If
21   you so request, a clerk of the court will prepare and
22   file a notice of appeal on your behalf.
23        The presentence report is made part of the record,
24   and is placed under seal, except counsel for the
25   government and defendants may have access to it for

1      purposes of appeal.

2            And both the defendants are remanded to the

3      custody of the United States Marshal and into the custody

4      of the United States Federal Bureau of Prisons to begin

5      service of sentence.

6            Were there any other counts?

7            MR. GONZALEZ:  Yes, Your Honor.  We would move to

8      dismiss any other counts that they did not plead guilty

9      to, and dismiss any other underlying Indictments that

10     they did not plead guilty to either.

11           THE COURT:  Okay.  That's granted.

12           So I'm remanding both to the custody of the United

13     States Marshal and into the Federal Bureau of Prisons to

14     begin service of sentence.

15           Is there a particular facility you wish to

16     request?

17           MR. MULDER:  Judge, just whatever is closest to

18     his family.  I would say Seagoville, probably.

19           THE COURT:  Well, the problem with Seagoville --

20           MR. MULDER:  It's crowded, and this may be too

21     long a sentence to be there.

22           THE COURT:  Yeah.  Is there another place you want

23     to ask for?

24           MR. MULDER:  Maybe Fort Worth.

25           THE COURT:  All right.

1          Mr. Jenkins?

2          MR. JENKINS:  The same for Daniel.  Closest to his

3     family as he can be.  We assume the same issue with

4     Seagoville, so Fort Worth.

5          THE COURT:  Okay.  I just don't know -- these are

6     long sentences.  I don't know, some place like Texarkana

7     might be better.

8          MR. JENKINS:  Wherever --

9          THE COURT:  I can recommend Fort Worth and see

10    what happens.  But if you think that there's another

11    place where you think you might want to be that's more

12    likely, you should ask for that.

13         MR. MULDER:  Why don't we go with Texarkana then.

14         THE COURT:  Okay.

15         MR. JENKINS:  I think that's more likely --

16    Texarkana.

17         THE COURT:  Okay.  Housed at Texarkana.  Okay.

18    All right.  I'll recommend that.  They may not want to

19    house them in the same facility, but that's another

20    issue.

21         Okay.  Is there anything further?

22         MR. MULDER:  Nothing from Cristian Mendoza, Your

23    Honor.

24         MR. GONZALEZ:  Nothing from the government.

25         MR. JENKINS:  Nothing from Daniel Mendoza.

1          THE COURT:  We're adjourned.

2                 (End of proceedings)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.
3

4
   /s/ Lori Barnett                    11/19/19
5  COURT REPORTER                      DATE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25